# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RICHARD MOONBLATT | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:07-CV-01922 |
| | ) | Judge J. D. Bates |
| DISTRICT OF COLUMBIA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANT DISTRICT OF COLUMBIA'S MOTION TO DISMISS
## OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant, the District of Columbia ("District"), through counsel, pursuant to Fed. R. Civ. P. 12(b)(6) and 56(c) as well as D.C. Code § 12-301(8) (2001 ed.) moves this Honorable Court to dismiss the complaint with prejudice as against the Defendant, or in the alternative, grant judgment in favor of the Defendant.  The bases for this motion are:

1.   Plaintiff failed to state a claim upon which relief can be granted pursuant to Title 42 U.S.C. §§ 1981 and 1983.

2.   Plaintiff's claims against the District of Columbia pursuant to Title 42 U.S.C. §§ 1981 and 1983, his negligence and negligent hiring and retention claims, his intentional infliction of emotional diversity [sic] claim, and his Violation of the District of Columbia Human Rights Act ("HRA") claim, all essentially based on *respondeat superior* liability, must fail as a matter of law as the Plaintiff has not alleged that the District of Columbia employed the corrections officers identified as assaulting and negligently/intentionally violating Plaintiff's rights.

3.   Count Six of the complaint must be dismissed with prejudice and without leave to amend. Plaintiff failed to bring his Human Rights Act claim within one year as required by the Act.

4.    For reasons more fully set forth in the Memorandum of Points and Authorities attached hereto and made a part hereof.

This is a contested motion.

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division


\s\ Kimberly M. Johnson
KIMBERLY M. JOHNSON [435163]
Chief, General Litigation Sec. I


\s\ Darrell Chambers
DARRELL CHAMBERS[1]
Assistant Attorney General
441 4TH Street, N.W., 6th Floor South
Washington, D.C.  20001
202-724-6539; 202-727-3625
E-mail: darrell.chambers@dc.gov

---

[1]  Pursuant to the Local Rules of the United States District Court for the District of Columbia, Darrell Chambers has registered with the Clerk's office as a Government Attorney and is appearing pursuant to LCvR 83.2.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RICHARD MOONBLATT )
)
Plaintiff, )
)
)
v. )      Civil Action No.: 1:07-CV-01922
)      Judge J. D. Bates
DISTRICT OF COLUMBIA, *et al.* )
)
Defendants. )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

### *Preliminary Statement*

Plaintiff filed the instant complaint on October 25, 2007, alleging violation of his

Civil Rights under Title 42 U.S.C. §§  1981 and 1983, negligence, negligent supervision,

hiring and retention, intentional infliction of emotional diversity [sic], and violation of the

District of Columbia Human Rights Act.  <u>See</u> complaint.  According to the complaint,

Plaintiff was incarcerated on or about January 6, 2004 – October 29, 2004, November 22,

2004 –February 28, 2005, and February 16, 2006 – December 30, 2006.  Plaintiff avers

that, beginning with his incarceration on January 6, 2004, up to and including November

22, 2006, he was subjected to a constant barrage of assaults, discrimination, derogatory

comments, and harassment too numerous to recount in this motion. <u>See</u> complaint.

Plaintiff theorizes that the District is liable under the theory of *respondeat superior* as

employer of Defendant Steve Smith ("Smith") and as employer of one or more "John

Doe" defendants. <u>See</u> complaint. Defendant Smith's liability is premised upon his supposed control over employees at the District of Columbia Jail. <u>See</u> complaint.

As is more fully set forth below, the complaint should be dismissed in its entirety, with prejudice and without leave to amend.

***Argument***

I.    **The Legal Standard.**

    A.    **Dismissal for failure to state a claim.**

While a complaint attacked by a Fed. R. Civ. P. 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Bell Atlantic Corp., et al. v. William Twombly, et al.*, 127 S. Ct. 1955 (2007). Factual allegations must be enough to raise a right to relief above the speculative level. *Bell Atlantic Corp.*, 127 S. Ct. at 1964. When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court. *Id.* at 1966.

A motion to dismiss for failure to state a claim should be granted when it appears that, under any reasonable reading of the complaint, the plaintiff will be unable to prove any set of facts that would justify relief.  *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C. Cir. 1987); *Conley v. Gibson,* 355 U.S. 41, 45 (1957) (complaint should not be dismissed for failure to state claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief).  The movant is not entitled to judgment if there are allegations in the complaint which, if proved, would

provide a basis for recovery. *Haynesworth,* 820 F.2d at 1254. As this Court has observed,

> When a party moves to dismiss for lack of subject-matter jurisdiction or for judgment on the pleadings, the court may consider the motion based on the complaint standing alone or, where necessary, on the complaint "supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." This standard follows from the "well-established practice -- endorsed by the Supreme Court forty-five years ago ... of allowing the District Court to make findings when a factual dispute regarding jurisdiction does arise."

*Dale v. Executive Office of the President,* 164 F. Supp. 2d 22, 25 (D.D.C. 2001) (citations omitted). *See also Longwood Village Restaurant, Ltd. v. Ashcroft,* 157 F. Supp. 2d 61, 66-67 (D.D.C. 2001).

### B.     <u>Summary Judgment.</u>

Fed. R. Civ. P. 56(c) provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

Once a movant for summary judgment has made the required showing under the rule, the burden shifts to the opposing party to show the existence of an issue of material fact. <u>Nader v. de Toledano</u>, 408 A.2d 31 (DC App. 1979), <u>cert. denied</u>, 444 US 1078 (1980). A motion for summary judgment should be granted unless the party opposing the motion counters the factual allegations with specificity. <u>Miller v. American Coalition of Citizens With Disabilities, Inc.</u>, 485 A.2d 186 (DC App. 1984).

The United States Supreme Court has held that in the case of a motion for summary judgment:

> the burden is not on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof. Instead, as we have explained, the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case.

Celotex Corporation v. Catrett, 477 US 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

## II.    To the extent the Complaint asserts rights under 42 U.S.C. § 1983, Plaintiff has failed to state a claim upon which relief can be granted.

Plaintiffs' assertion of jurisdiction under 42 U.S.C. § 1983, and Plaintiffs' seeming claims for relief under that statute, are plainly in error.  42 U.S.C. § 1983 states:

> Every person, who under color of a statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proceedings for redress.

In any Section 1983 action against a municipality such as the District of Columbia, the burden is on the plaintiffs to establish that the municipality has a custom or practice that caused the alleged constitutional or statutory violation.  See e.g., *Monell v. New York City Dep't. of Social Services*, 436 U.S. 658, 690-91, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978); *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000).  *F. E. Carter, v. District of Columbia,* 14 F. Supp. 2d 97 (1998); *City of Canton v. Harris*, 489 U.S. 378, 385, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989); *Haynesworth v. Miller*, 261 U.S. App.

D.C. 66, 820 F.2d 1245, 1271-72 (D.C. Cir. 1987). More specifically, plaintiff must allege that defendant's discriminatory action was due to its maintenance of a "longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Carter,* 14 F. Supp. 2d at 102. S*ee also, Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737, 105 L. Ed. 2d 598, 109 S. Ct. 2702 (1989). The U.S. Supreme Court requires a plaintiff seeking to impose liability on a municipality under Section 1983 to demonstrate that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." <u>*Board of the County Commissioners of Bryan County v. Brown*</u>, 520 U.S. 397, 404 (1997). The D.C. Circuit has equated "moving force" with "proximate cause." *See Morgan v. District of Columbia*, 824 F.2d 1049, 1058 (D.C. Cir. 1987). Plaintiff's complaint is patently devoid of any such allegations. Other than a bald assertion of Section 1983 as a basis for the Court's jurisdiction, there are no allegations in the Complaint with respect to a longstanding practice or custom which constitutes the standard operating procedure of the District, a necessary predicate to the District's liability under Section 1983.

Notwithstanding this fatal deficiency in Plaintiff's complaint, his Section 1983 claim must fail for another reason. If the government officials alleged to have committed the constitutional violations lack "final policymaking authority," their mere exercise of discretion, not in service of any municipally established policy, is insufficient to render the District liable. *Triplett v. District of Columbia*, 108 F.3d 1450 (D.C. Cir. 1997) (*quoting Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989)). Relevant case law has held that Section 1983 liability cannot lie against a municipality under principles of *respondeat superior*. *Triplett* Id. at 1453 *citing Monell v. New York City Dept. of Social*

*Services*, 436 U.S. 658, 691, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).  Although *Monell* allows claims based upon a well-settled municipal custom, plaintiff must "show fault on the part of the city based on a course its policymakers consciously chose to pursue," *Monell* 436 U.S. at 690-91; see also *Carter v. District of Columbia*, 254 U.S. App. D.C. 71, 795 F.2d 116, 122 (D.C. Cir. 1986).   "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be … *respondeat superior* liability," which *Monell* has rejected. *St. Louis v. Praprotnik*, 485 U.S. 112, 126, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988) (O'Connor, J., plurality opinion). The only acts that count (though they may include inaction giving rise to or endorsing a custom) are ones by a person or persons who have "final policymaking authority [under] state law." *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737, 105 L. Ed. 2d 598, 109 S. Ct. 2702 (1989) (internal citations and quotations omitted).  Plaintiff cannot meet this high burden.  Plaintiff has not alleged, and cannot prove, that the individually named defendants were such "policymaking" officials. Plaintiff has not alleged, nor can he prove any set of facts which would justify relief under Section 1983.   There was no "municipally established policy" to deprive plaintiff of his constitutional rights, nor is one alleged in the complaint.  Plaintiff's Count I claim under 42 U.S.C. § 1983 must be dismissed.

## III.      Plaintiff's claim under 42 U.S.C. § 1981 must be dismissed because Plaintiff does not allege a violation of his right to make and enforce contracts.

Plaintiff has not pled a proper 42 U.S.C. § 1981 claim.  That section of the Civil Rights Act specifically protects the right of individuals to make and enforce contracts.  Thus, to make out a colorable Section 1981 claim, Plaintiff must allege, and prove, that

his right to make and enforce a contract has been infringed.  The Supreme Court recently

stated in *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 at 475 (2006):

> Among the many statutes that combat racial discrimination, § 1981, originally § 1 of the Civil Rights Act of 1866, 14 Stat. 27, has a specific function: It protects the equal right of "all persons within the jurisdiction of the United States" to "make and enforce contracts" without respect to race. The statute currently defines "make and enforce contracts" to "include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b).

Plaintiff has not alleged that the District, or any of the Defendants, infringed upon his

right to make and enforce contracts.  No reading of the Plaintiff's complaint, however

strained, would entitle him to relief under Section 1981.  Thus, Plaintiff's claim based on

that section must be dismissed.

**IV.    Plaintiff's claim under 42 U.S.C. § 1981 should be dismissed because Plaintiff fails to allege that the District's custom or policy violated his rights.**

In order to maintain a claim against the District under 42 U.S.C. § 1981, Plaintiff

must allege and establish that a custom or policy of the Defendant was the moving force

that caused her harm.  *Jett v. Dallas Independent School District,* 491 U.S. 701, 710-737

(1989) partially superseded by statute as stated in *Cheung v. Wambolt*, 2005 U.S. Dist.

LEXIS 10808 (D. Me. June 2, 2005).  Since Plaintiff has failed to make such allegations

and indeed cannot prove that the District's custom or policy, approved by one of the

District's policymakers, was the cause of his alleged injuries, count two of the complaint

should be dismissed and judgment entered for the District.

In 1987, when *Jett* was decided, 42 U. S. C. § 1981 provided that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make

and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and no other."

The statute did not provide for liability against the government. *Jett, supra.*

In *Jett*, however, the Supreme Court addressed two critical issues relating to municipal liability under Section 1981.  *Jett* was an employment discrimination case where a white teacher sued the principal and school district claiming that his termination from his coaching job was because of his race.  Plaintiff brought suit under Sections 1981 and 1983.  First, the Supreme Court held that Section 1983 was plaintiff's exclusive remedy for any alleged violations of his rights, and under Section 1983 the school district could not be held liable under a theory of *respondeat superior. Jett*, 491 U.S. at 731. Second, and on point with the issues in the instant case, the Supreme Court held that the "custom and policy" analysis announced in *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), applies to municipal liability under §1981. *Jett*, 491 U.S. at 731.

In 1991, the Civil Rights Act of 1991, Section 101 amended Section 1981 by adding two subsections, one of which was Section 1981(c).  This new subsection provides that "the rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).  The 1991 amendment to Section 1981 provided for direct liability against government entities and reversed the Supreme Courts' holding in *Jett* as to this question.

The amendment did not, however, effect the Supreme Court's holding as to the custom and policy required. *Powell v. City of Pittsfield,* 143 F. Supp. 2d 94, 110-114

(D.Mass. 2001).  Since the 1991 amendment to Section 1981, courts have consistently applied the custom and policy analysis to Section 1981 claims against municipalities. *Medina v. District of Columbia* 2007 U.S. Dist. (Decided June 6, 2007) (Sullivan, J.) (custom and policy analysis applied to a violation of rights under §1981); *Taylor, et al. v. District of Columbia Water & Sewer Authority*,  241 F.R.D. 33, n5 (Decided March 13, 2007) (Kennedy, J.) (The requirement of a common policy applies to intentional discrimination under Section 1981); *Federation of African Am. Contractors*, *et al. v. City of Oakland, et al.,* 96 F.3d 1204, 1215 (Ninth Cir. 1996); *Johnakin v. City of Philadelphia*, 1996 U.S. Dist. LEXIS 445, No. Civ. A. 95-1588, 1996 WL 18821, at *4 (E.D. Pa. Jan. 18, 1996); *Gallardo v. Bd. Of County Comm'rs*, 857 F. Supp. 783, 786-87 (D. Kan. 1994); *see also Philippeaux v. N. Cent. Bronx Hosp.*, 871 F. Supp. 640, 654-56 (S.D.N.Y. 1994) (not resolving whether section 1981(c) overturns *Jett*'s first principal, but holding that "policy or custom" must yet be established).  Thus, in order to maintain a claim against the District under Section 1981, Plaintiff must still allege and prove that his injuries were caused by a custom or policy approved by a District policymaker in accordance with *Monell, supra.* Having not even alleged such a custom or policy by the District, Plaintiff's claim based on Section 1981 must be dismissed.

**V.     Plaintiff's DCHRA claims should be dismissed for all acts occurring prior to February 16, 2006 because the DCHRA claims as they pertain to such acts are time barred.**

Plaintiff's claims under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.11, are time barred as they pertain to acts that occurred prior to February 16, 2006.  To satisfy the procedural requirements of the DCHRA, an individual must file their complaint within one year of the alleged discriminatory act. D.C. Code §

2-1403.16 (2007). Plaintiff was incarcerated on or about January 6, 2004 – October 29, 2004, November 22, 2004 –February 28, 2005, and February 16, 2006 – December 30, 2006. His complaint was not filed until October 25, 2007. See complaint. By Plaintiff's own admission, he was released from the custody of the Department of Corrections on or about October 29, 2004. Thus, the one year statute of limitations for DCHRA violations which took place during his first period of incarceration (from January 6, 2004 through October 29, 2004) began to run upon his release on October 29, 2004 and suit had to be filed no later than October 29, 2005. Likewise, by Plaintiff's own admission, he was released from the custody of the Department of Corrections on or about February 28, 2005. The one year statute of limitations for DCHRA violations which took place during his second period of incarceration from November 22, 2004 through February 28, 2005, began to run upon his release on February 28, 2005, and suit had to be filed no later than February 28, 2006. The instant suit was not filed until October 25, 2007, therefore, all DCHRA claims alleging discriminatory acts that occurred between January 6, 2004 and February 28, 2005, are time barred and must be dismissed.

**VI.    Plaintiff's claims against the District of Columbia fail because plaintiff was not assaulted or deprived of his constitutional rights by a District of Columbia employee or agent.**

Plaintiff claims against the District are premised upon the Plaintiff's allegations that the District's employees committed various unlawful acts against him. See complaint. The D.C. Court of Appeals has considered several factors in determining whether a master-servant relationship exists: (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the

employer.  Moorehead v. District of Columbia, 747 A.2d 138, 143 (D.C. 2000).  The "decisive test is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done."  Brown v. Safeway Stores, Inc., 782 A.2d 752, 759 (D.C. 2001).

In Moorehead, the D.C. Court of Appeals held that the District's comprehensive licensing and regulation of special police officers (SPOs) did not make SPOs agents of the District of Columbia.  Id. at 144-145.  The Court reasoned that "broad regulation of an activity authorized by the District does not, by itself, demonstrate control over persons involved in that activity."  Id. citing Hampton v. District of Columbia, 666 A.2d 30 (D.C. 1995)(holding that the District's comprehensive rules and regulations governing foster homes did not establish that the District actually controlled foster parents in the performance of their duties rendering them agents of the District).

Count one of the complaint alleges that Plaintiff was treated differently from other inmates because he is white, Jewish, and homosexual. See complaint.  Count two alleges Plaintiff was not afforded equal rights because of his race, religion, and sexual orientation. See complaint.  Count three alleges that Defendants negligently failed to supervise and take care of the plaintiff while he was within their custody.  See complaint. Count four alleges that the Defendants failed to properly supervise, train, hire, and monitor the actions of correctional officers. See complaint.  Count five alleges that the Defendants intentionally inflicted emotional distress upon Plaintiff. See complaint. Count six alleges that the Defendants violated the District of Columbia Human Rights Act. See complaint. Each count in the complaint alleges "as a result of the action and inactions of the defendants individually and through their agents and employees, the

plaintiff suffered physical damage, mental damage and duress…" Since the District is a municipal corporation, not a natural person, it cannot act individually but only through its agents and employees. Thus, plaintiff's claim against the District is wholly based on, and reliant for survival upon, the tort theory of *respondeat superior.*

According to plaintiff, the alleged predicate constitutional violation was the denial of medical treatment, running water, recreation time, and adequate clothing along with other privileges afforded other inmates in violation of his right to equal protection of the law. See complaint. Plaintiff also claims he was subjected to assault and sexual and religious harassment at the hands of certain corrections officers or at the hands of other inmates with corrections officers turning a blind eye to the alleged violations. See complaint. It is undisputed that the complaint does not identify any of the corrections officers named in the complaint as District employees[2]. See complaint. Nor does Plaintiff specify which facility he was in when these alleged violations occurred. The District contracts with Corrections Corporation of America, Inc. ("CCA"), to operate the Correctional Treatment Facility ("CTF"). See Exhibit A, Article 1. CCA officers are not agents of the District of Columbia. See Exhibit A, Article 9. In the District of Columbia, the general rule "is that when [someone or some entity] hires another to do certain work, reserving no control over either the work or the workmen, a relationship of contractee and contractor exists (as opposed to master and servant) and the contractee is not liable for injuries to a third party resulting from the work of the independent contractor**."** W.M. Schlosser Co. v. Maryland Drywall Co., 673 A.2d 647, 651 (D.C. 1996), citing

---

[2] While the complaint names eighteen people, Lieutenant Holmes, Sergeants McIntyer and Marion, Corporals Knight, Gordon, and Thomas, and officers Murray, Jordon, William, Davis, Little, Robert, Wisler, Cooper, Cob, Jordan, Jackson, and Drummond, as individuals responsible for assaulting, harassing, and violating Plaintiff's Constitutional rights, it has not been alleged that they are employees of the District.

<u>Washington Metro. Area Transit Auth. v. L'Enfant Plaza Prop., Inc.</u>, 448 A.2d 864 (D.C. 1982) ("general rule is that an individual or corporation is not liable for injuries resulting from the work of an independent contractor.")  "This general rule encompasses the view that those using independent contractors should not be held responsible for activities they do not control and often lack the knowledge and resources to direct."  <u>Id</u>. citing *Restatement (Second) Of Torts* § 409 cmt. b (1985).

In the instant case, the District has contracted CCA to operate the CTF. See Exhibit A, Article 1.  Plaintiff cannot prove that the District of Columbia Government controlled CCA officers in the performance of their day to day duties.  In accordance with the contract between the District and Corrections Corporation of America, the latter is required to operate and maintain the Correctional Treatment Facility. See Exhibit A, Article 1.  CCA is responsible for the assignments of its officers, scheduling of shifts, training, equipping, and supervising the manner in which its officers performed their day-to-day duties.  Plaintiff's sole allegation concerning a District employees' involvement in the alleged events involves Defendant Smith, identified as a warden at the D.C. Jail. <u>See</u> complaint.  Plaintiff alleges that Defendant Smith had a duty to supervise District employees at the D.C. Jail. <u>See</u> complaint.  However, since the individuals alleged to have committed acts against the Plaintiff were not identified as District employees, clearly Defendant Smith had no duty, or authority, to supervise them.  As explained above, Plaintiff's constitutional claims must fail nonetheless, as he must establish that the District has a custom or practice that caused the alleged constitutional or statutory violation. See *Monell v. New York City Dep't. of Social Services*, 436 U.S. 658, 690-91, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).  The *Monell* court rejected the theory that the mere

exercise of discretion by an employee could give rise to a constitutional violation, respondeat superior liability.  Thus, this court should dismiss the complaint against the District, or in the alternative, enter a judgment in the District's favor.

## Conclusion

Based upon the foregoing, it is respectfully submitted that the plaintiff's complaint should be dismissed with prejudice for failure to state a claim upon which relief can be granted, or in the alternative that the defendant District of Columbia is entitled to entry of judgment in its favor.

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

\s\ Kimberly M. Johnson
KIMBERLY M. JOHNSON [435163]
Chief, General Litigation Sec. I

\s\ Darrell Chambers
DARRELL CHAMBERS
Assistant Attorney General
441 4TH Street, N.W., 6th Floor South
Washington, D.C.  20001
202-724-6539; 202-727-3625
darrell.chambers@dc.gov

## <u>CERTIFICATE OF SERVICE</u>

      This certifies that on this  3rd      day of  December, 2007, a true and correct copy of the foregoing Motion to Dismiss or in the Alternative, for Summary Judgment, was sent electronically, to: Warren E. Gorman, Esquire, 5530 Wisconsin Avenue Suite 1209 Chevy Chase, MD 20815, Attorney for Plaintiff.

      \s\ Darrell Chambers         
      DARRELL CHAMBERS

### <u>CERTIFICATE PURSUANT TO LOCAL RULE 12-I</u>

      I hereby certify that I contacted Plaintiff's counsel, Warren E. Gorman, and left a message on his voicemail, on the 3rd day of December, 2007, to request his consent to this Motion; however, I was unable to reach counsel for the Plaintiff.

      \s\ Darrell Chambers         
      DARRELL CHAMBERS

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RICHARD MOONBLATT | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) Civil Action No.: 1:07-CV-01922 |
| | ) Judge J. D. Bates |
| DISTRICT OF COLUMBIA, *et al.* | ) |
| | ) |
| Defendants. | ) |
| ———————————————— | ) |

**DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS**

1.  Plaintiff's complaint was filed on October 25, 2007.

2.  Plaintiff was incarcerated on or about January 6, 2004 until October 29, 2004.

3.  Plaintiff was incarcerated on or about November 22, 2004 until February 28, 2005.

4.  Plaintiff was incarcerated on or about February 16, 2006 until December 30, 2006.

5.  None of the corrections officers specifically identified by name in the complaint are alleged to be District employees.

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

\s\ Kimberly M. Johnson
KIMBERLY M. JOHNSON [435163]
Chief, General Litigation Sec. I

\s\ Darrell Chambers
DARRELL CHAMBERS
Assistant Attorney General
441 4TH Street, N.W., 6th Floor South
Washington, D.C.  20001
202-724-6539; 202-727-3625

# LEASE AGREEMENT

# By and Between

# CORRECTIONS CORPORATION OF AMERICA

# As Lessor

# And

# THE DISTRICT OF COLUMBIA
# As Lessee

EXECUTION COPY

# LEASE AGREEMENT

## by and between

## CORRECTIONS CORPORATION OF AMERICA

### as Lessor

### and

## THE DISTRICT OF COLUMBIA

### as Lessee

# TABLE OF CONTENTS

Page

ARTICLE 1     RECITALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

ARTICLE 2     DEFINITIONS; INTERPRETATION . . . . . . . . . . . . . . . . . . . . .     2
2.1           Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2
2.2           Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     4

ARTICLE 3     CONSTRUCTION OF IMPROVEMENTS . . . . . . . . . . . . . . . .     5
3.1           Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     5
3.2           Compliance With Law . . . . . . . . . . . . . . . . . . . . . . . . . . . .     5
3.3           Subcontractors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     5
3.4           No Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     5
3.5           Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6
3.6           Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6
3.7           Variation from Cost Estimate . . . . . . . . . . . . . . . . . . . . . .     6
3.8           Bonding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6

ARTICLE 4     DEMISE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6

ARTICLE 5     TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7
5.1           Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7
5.2           Termination for Convenience . . . . . . . . . . . . . . . . . . . . . .     7

ARTICLE 6     LEASE PAYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7
6.1           Payment of Lease Payment . . . . . . . . . . . . . . . . . . . . . . .     7
6.2           Invoice for Lease Payment . . . . . . . . . . . . . . . . . . . . . . . .     8
6.3           Nonappropriation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

ARTICLE 7     USE OF CTF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8
7.1           Permitted Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

ARTICLE 8     TAXES, UTILITIES, AND OTHER CHARGES . . . . . . . . . . . .     8
8.1           Real Estate Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8
8.2           Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9
8.3           Utilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

ARTICLE 9     INSURANCE AND INDEMNIFICATION . . . . . . . . . . . . . . . .     9
9.1           Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9
9.2           Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

-i-

ARTICLE 10    MAINTENANCE AND REPAIR OF THE CTF . . . . . . . . . . . .  11

ARTICLE 11    ASSIGNMENT AND SUBLETTING  . . . . . . . . . . . . . . . . .  11
    11.1    Assignment of the District's Interest . . . . . . . . . . . . . . . . .  11
    11.2    Assignment of Lessor's Interest  . . . . . . . . . . . . . . . . . . .  11
    11.3    Effect of Assignment . . . . . . . . . . . . . . . . . . . . . . . . . .  11

ARTICLE 12    DEFAULT AND REMEDIES . . . . . . . . . . . . . . . . . . . . .  11
    12.1    Default  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
    12.2    Remedies of Lessor . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
    12.3    Remedies on Event of Default of Lessor . . . . . . . . . . . . . . .  13
    12.4    Delay; Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
    12.5    No Additional Waiver Impaired by One Waiver . . . . . . . . . . .  13
    12.6    Remedies Are Cumulative . . . . . . . . . . . . . . . . . . . . . . .  13

ARTICLE 13    CERTAIN OBLIGATIONS OF LESSOR . . . . . . . . . . . . . . . .  14
    13.1    Sale of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
    13.2    Maintenance of Corporate Existence and Business . . . . . . . .  14
    13.3    Business Activities; Indebtedness  . . . . . . . . . . . . . . . . . .  14

ARTICLE 14    LESSOR'S REPRESENTATIONS . . . . . . . . . . . . . . . . . . .  14

ARTICLE 15    DAMAGE, DESTRUCTION AND CONDEMNATION . . . . . . . .  15
    15.1    Damage, Destruction, Condemnation . . . . . . . . . . . . . . . .  15
    15.2    Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

ARTICLE 16    THE DISTRICT'S REPRESENTATIONS  . . . . . . . . . . . . . . .  15

ARTICLE 17    TRANSFER OF TITLE . . . . . . . . . . . . . . . . . . . . . . . . .  16

ARTICLE 18    PURCHASE OPTION  . . . . . . . . . . . . . . . . . . . . . . . . .  16

ARTICLE 19    DISPUTE RESOLUTION  . . . . . . . . . . . . . . . . . . . . . . .  16
    19.1    Contract Monitor . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16
    19.2    Right to Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

ARTICLE 20    GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . .  18
    20.1    Notices  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
    20.2    Time of the Essence  . . . . . . . . . . . . . . . . . . . . . . . . . .  19
    20.3    Computation of Time . . . . . . . . . . . . . . . . . . . . . . . . . .  19
    20.4    Relationship of the Parties  . . . . . . . . . . . . . . . . . . . . . . .  19
    20.5    Severability  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
    20.6    Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
    20.7    Entire Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
    20.8    No Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

20.9     Interpretation and Definition . . . . . . . . . . . . . . . . . . . . . . . .  19
20.10    Memorandum of this Lease . . . . . . . . . . . . . . . . . . . . . . . . .  20
20.11    Representation of Authority  . . . . . . . . . . . . . . . . . . . . . . . .  20
20.12    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
20.13    Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
20.14    Compliance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
20.15    No Merger  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

<u>EXHIBITS</u>

Exhibit A     -     Description of CTF Parcel and Personal Property Conveyed
Exhibit B     -     List of Improvements to be Made by Lessor
Exhibit C     -     Lease Payment Schedule
Exhibit D     -     Form of Memorandum of Lease

# LEASE AGREEMENT
by and between
## CORRECTIONS CORPORATION OF AMERICA
and
## THE DISTRICT OF COLUMBIA

This LEASE AGREEMENT (this "Lease") dated as of this _____ day of _____, 1996, is entered into by and between CORRECTIONS CORPORATION OF AMERICA, a corporation duly organized and existing under the laws of Delaware (the "Lessor") and THE DISTRICT OF COLUMBIA, a municipal corporation (the "District" or the "Lessee").

## ARTICLE 1
### RECITALS

WHEREAS, the District wishes, acting through its Department of Corrections, to provide the public with prison services that are cost efficient and effective with respect to the purposes and goals of incarceration;

WHEREAS, the District wishes to provide inmates with proper care, custody, treatment, rehabilitation and reformation;

WHEREAS, the District wishes to provide the public and inmates with prison services that meet the requirements of the Court Orders (hereinafter defined), the standards of the American Correctional Association and the National Commission on Correctional Health Care for Prisons and other standards that may be promulgated by the District;

WHEREAS, the Lessor has submitted a proposal (the "Operator's Proposal"), including a best and final offer, to operate and maintain the District's Correctional Treatment Facility (the "CTF") for a period of twenty (20) years;

WHEREAS, the District wants the Lessor and the Lessor has agreed, to operate and maintain the CTF;

WHEREAS, the District wishes Lessor to renovate and improve the CTF and make it available to the District in accordance with the terms of the Proposal and this Lease;

WHEREAS, this Lease is being entered into pursuant to the Operator's Proposal.

NOW, THEREFORE, for and in consideration of the foregoing and the promises and mutual covenants hereinafter contained, and subject to the conditions herein set



forth, the District and the Lessor hereby covenant, agree, and bind themselves as follows:

## ARTICLE 2
### DEFINITIONS; INTERPRETATION

2.1    Definitions. The following terms shall have the meanings hereinafter set forth.

"ACA Standards" means the American Correctional Association Standards for the Adult Correctional Institutions (Third Edition), together with any future amendments or additions.

"Business Day" means any day other than a Saturday, Sunday or legal holiday in the District, as specified in the District of Columbia Code.

"Concluding Payment" means the amount shown under the column entitled "Concluding Payment" as of each date shown on the Lease Payment Schedule.

"Court Orders" means Women Prisoners of the District of Columbia Department of Corrections v. District of Columbia, 877 F. Supp. 634 (D.D.C. 1994) as modified by Women Prisoners of the District of Columbia Department of Corrections v. District of Columbia, No. 95-7041 (D.C. Cir. Aug. 30, 1996); Twelve John Does v. District of Columbia, C.A. No. 80-2136 (June L. Green, J.), Consent Decree Amending Final Settlement Agreement and Consent Decree of April 28, 1982, the Amended Decree of August 18, 1983 and the Amended Decree of March 4, 1985, filed December 17, 1990; and Campbell v. McGruder, C.A. No. 1462-71 (WBB) and Inmates of D.C. Jail v. Jackson, C.A. No. 75-1668 (cases consolidated before Judge William B. Bryant) and any other Court Order made applicable to the Facility during the term of this Lease.

"CTF" means the building known as the Correctional Treatment Facility in Washington, D.C., located on land described on Exhibit A attached hereto, and the tangible personal property therein as of the Service Commencement Date.

"District" means the District of Columbia, a municipal corporation.

"DOC" means the Department of Corrections, a department of the Government of the District of Columbia and its successors.

"Effective Date" means the first day on which this Lease has been executed by both Lessor and the District.



"Event of Default" means an event of default set forth in Article 12 hereof.

"Event of Nonappropriation" means, pursuant to Article 6.3 hereof, the failure to appropriate in any Fiscal Year funds sufficient to pay the Lease Payments and other amounts due during the succeeding Fiscal Year.

"Expiration Date" means the last day of the 240th calendar month following the Service Commencement Date.

"Fiscal Year" means the fiscal year of the Government of the District of Columbia, which is currently the period commencing October 1 and ending the succeeding September 30, as such period may be changed from time to time.

"Improvements" means the improvements to the CTF described in Exhibit B hereto.

"Lease Payments" means the payments listed under the column labeled "Lease Payments" on Exhibit C.

"Lease Payment Date" means the dates listed under the column labeled Lease Payment Date on Exhibit C hereto.

"Lease Payment Schedule" means the schedule of Lease Payments set forth on Exhibit C hereto.

"Lessor" means the Corrections Corporation of America, its successors and permitted assigns.

"O&M Agreement" means that certain Operations and Management Agreement dated as of _____ __, 1996 by and between the District and the Lessor.

"Operator" means Lessor in its capacity as Operator of the CTF under the O&M Agreement.

"Operator's Proposal" means collectively Volumes I, I-A and II dated August 8, 1996, the Best and Final Offer dated August 20, 1996, and the letter to Wanda Moorman of the Department of Administrative Services dated August 29, 1996 from Linda A. Staley, regarding the Correctional Treatment Facility Privatization Program, Clarification - Best and Final Offer, all submitted by the Operator with respect to the privatization of the operations of the CTF, as amended and supplemented in writing during the negotiation of the O&M Agreement.

"Real Estate Taxes" shall have the meaning given such term in Article 8.1 of this Lease.

"Service Commencement Date" means the date on which the Operator shall begin providing operation and management services at the CTF in accordance with the terms of the O&M Agreement.

"Term" shall have the meaning provided in Article 5 hereof.

2.2     Interpretation.

2.2.1     Titles and headings are included for convenience only and shall not be used for the purposes of construing or interpreting this Lease.

2.2.2     Words denoting the singular also include the plural, and vice versa, where the context requires. Words denoting natural persons or parties shall include firms and corporations and any organization having legal capacity. Any reference to a particular gender shall include the other gender.

2.2.3     The word "include" and "including" shall be deemed to be followed by the words "without limitation."

2.2.4     All references contained herein to contracts or other documents shall be deemed to mean such contracts or documents, as the same may be modified, supplemented or amended from time to time.

2.2.5     References to any recitals, clauses or exhibits are, unless the context otherwise clearly requires, references to the recitals, clauses of, and exhibits to, this Lease. References in this Lease containing terms such as "hereof," "hereto," "hereby," "hereinafter," and other terms of like import are not limited in applicability to the specific provision within which such references are set forth but instead refer to this Lease taken as a whole.

2.2.6     Any provision requiring that a party obtain the approval, consent or concurrence of the other party shall be deemed to include a requirement that the approval, consent or concurrence of such other party shall not be unreasonably withheld or delayed, unless such approval, consent or

concurrence is stated to be within the sole discretion of such other party.

## ARTICLE 3
## CONSTRUCTION OF IMPROVEMENTS

3.1     Construction. The Lessor, at its sole cost and expense, shall procure, construct and install the Improvements.  The construction and installation of the Improvements shall be completed within one hundred eighty (180) days from the Service Commencement Date, unless another date is agreed to in writing by both parties.  The Lessor shall ensure that upon completion of the Improvements, the CTF shall meet or exceed all structural and facility requirements of the ACA Standards and the Court Orders.

3.2     Compliance With Law.  The construction and installation of the Improvements, and the completed Improvements, shall be in compliance with all applicable law.   The Lessor shall remove and dispose of (in accordance with all applicable law) any pollutants or contaminants released during the construction and installation of the Improvements.

3.3     Subcontractors. The Lessor shall not subcontract any of its material obligations and responsibilities hereunder without the prior written consent of the District. If the District agrees to the Lessor subcontracting some of the construction and installation work to be performed under this Section 3.3, the Lessor hereby guarantees that any subcontractor shall comply with the terms of this Lease.  The Lessor shall remain responsible for the performance of all work to be performed hereunder in accordance with the terms of this Lease, regardless of whether some or all of such services or work are subcontracted.  A subcontractor's failure to comply with the terms of this Lease shall be deemed a failure by the Lessor to comply with the terms of this Lease.  No contractual relationship shall exist between the District and any subcontractor, and the District shall accept no responsibility whatsoever for the conduct, actions, or commissions of any subcontractor selected by the Lessor. The Lessor shall deliver to the District a copy of each contract with a subcontractor within thirty (30) days after its execution of such contract.  In connection with its entering into contracts with subcontractors, the Lessor shall cause the representations, warranties and covenants of the subcontractor in each such contract to be assigned to the District.

3.4     No Liens. Lessor shall be solely responsible for payment of all costs of the Improvements, including payments to any subcontractors, suppliers and employees.  Lessor shall keep the CTF free of mechanic's, vendors, materialmen or other liens.  If any lien is filed against the CTF, Lessor will promptly commence appropriate action to remove such lien and shall thereafter diligently pursue the release

of such lien.    Lessor shall indemnify the District against any costs, including reasonable attorneys' fees, which the District may sustain as a result of any such lien.

3.5    Inspection.    The District shall have the right to inspect the Improvements during and at the end of the construction period. If any component of the Improvements found by the District, the Operator, the American Correctional Association, or other appropriate entity or organization to be defective, deficient and/or not in conformance with Exhibit B and all applicable laws and regulations governing such work, Lessor shall, at its expense and within a reasonable period after receipt of written notice of such deficiencies not to exceed 90 days, correct such deficiencies.

3.6    Cooperation.    Upon the reasonable request of the Lessor, the District shall execute such documents, petitions, applications and authorizations as may be reasonably appropriate or required for the purpose of obtaining from the appropriate government agencies all zoning changes, variances, and conditional use permits and all other permits required for the construction and installation of the Improvements.

3.7    Variation from Cost Estimate.    Lessor shall be solely responsible for all costs associated with the construction and installation of the Improvements. Not later than ninety days after completion of the Improvements, Lessor shall provide the District with an accounting of Lessor's expenditures in connection with the construction and installation of the Improvements. If the total of such expenditures is less than $3,850,000, then the total amount of Lease Payments to be made over the Term of the Lease shall be reduced by an amount equal to the amount of such shortfall, and each individual Lease Payment shall be reduced proportionately.

3.8    Bonding.    Prior to commencing work on the construction and installation of the Improvements, Lessor shall furnish payment and performance bonds in the full amount of the cost of the Improvements.

**ARTICLE 4**
**DEMISE**

The Lessor, in consideration of the Lease Payments, does lease and demise to the District, and the District does rent and accept from the Lessor, the CTF.

## ARTICLE 5
## TERM

5.1    Term.    This Lease shall be for a term (the "Term") which shall commence upon the Service Commencement Date and shall expire at midnight on the Expiration Date, unless this Lease is terminated earlier, upon the occurrence of one of the following events:

(a)    the end of the Fiscal Year in which an Event of Nonappropriation occurs, or, if the Congress of the United States has not adopted at the end of a Fiscal Year a budget for the District for the succeeding Fiscal Year, the end of the period for which funds have been appropriated and are available for payment of amounts due hereunder;

(b)    the occurrence of an Event of Default and the election of the non-defaulting party to terminate this Lease pursuant to Article 12 hereof; or

(c)    the termination of the O&M Agreement and the election of the District to terminate this Lease; or

(d)    the District's exercise of its option to terminate this Lease pursuant to Article 5.2 hereof.

5.2    Termination for Convenience.    The District may terminate this Lease for convenience without cause by giving written notice to the Lessor, at least ninety (90) days prior to the effective date of such termination. Upon a termination for convenience, Lessor and the District will cooperate in developing a plan for financing the District's payment of the remaining unpaid balance of the Lease Payments, with the objective of achieving payment of all Lease Payments not later than 180 days after the date of termination. Within 45 days after termination for convenience, the District will engage an underwriter to assist in financing such payment, and within 90 days after such termination, the District will submit a financing and payment plan for approval by the District of Columbia Council.

## ARTICLE 6
## LEASE PAYMENT

6.1    Payment of Lease Payment.    The District shall pay Lease Payments to the Lessor on the Lease Payment Dates at the Lessor's address set forth in Article 20.1 or at such place or to such persons as the Lessor may from time to time designate in writing by notice to the District. Except as provided in Article 6.3, the obligation of the District to pay Lease Payments shall be unconditional.

6.2    Invoice for Lease Payment.  The Lessor shall bill the District monthly in arrears for the Lease Payments due under Article 6.1.  Payment by the District shall be due forty five (45) days after its receipt of a properly documented invoice.  The Lease Payments shall be in the amounts set forth in Exhibit C-1, provided that if there has been a termination of the O&M Agreement for cause, Lease Payments shall be recalculated as provided in Exhibit C-2.

6.3    Nonappropriation.    Upon  the  occurrence  of  an  Event  of Nonappropriation,  this  Agreement  shall  terminate  and  be  cancelled  upon  the exhaustion of the funding authorized for the current Fiscal Year and the District shall have  no  further  obligation  to  pay  Lease  Payments  upon  the  exhaustion  of  such funding; provided, however, this Lease shall remain in full force and effect so long as the Congress of the United States has failed to approve a budget for the District for such Fiscal Year, and funds are lawfully available to the District for payment of the Lease Payments and any other amounts coming due hereunder during such period. the District shall provide the Lessor with written notice of such nonappropriation as soon as possible after the Event of Nonappropriation occurs.

## ARTICLE 7
## USE OF CTF

7.1    Permitted Use.  The District shall use the CTF, or cause the CTF to be used, for any lawful purpose.  The parties acknowledge that the District intends to retain the Lessor as the Operator, pursuant to the O&M Agreement, to operate and manage the CTF.

## ARTICLE 8
## TAXES, UTILITIES, AND OTHER CHARGES

8.1     Real Estate Taxes.  During the Term, the District agrees to pay as additional rent, in addition to the Lease Payments described in Article 6, any Real Estate Taxes imposed on Lessor as owner of the CTF building.  The District shall make such payments within thirty (30) days after it has received a letter from Lessor requesting same, accompanied by all supporting evidence and receipt-paid tax bills, without further notice, demand, setoff or counterclaim.  The District shall have the right to audit Lessor's books in this regard during normal business hours upon three (3) days' prior written notice, and Lessor shall make such books available in the District within two weeks of the District's request.  If the amount paid by the District for Real Estate Taxes exceeds the actual amount paid by Lessor for such year, the excess  shall  be  credited  toward  the  payment  of  the  next  installment  of  Lease Payments to be paid by the District after the District notifies Lessor of such excess payment.  If the amount paid by the District during the last calendar year of the Term

-8-



exceeds the District's share of actual Real Estate Taxes for such year, Lessor shall pay the District the excess amount promptly after the District notifies the Lessor of such excess payment. Lessor shall have no obligation to contest, object to or litigate the levying, assessment or imposition of Real Estate Taxes, and may settle, compromise, consent to, waive or otherwise determine any such Real Estate Taxes without consent of the District.

8.2    Definition.    "Real Estate Taxes" shall mean all taxes and assessments, general or special, ordinary or extraordinary, foreseen or unforeseen, assessed, levied or imposed upon the fixtures, machinery, equipment or systems in, upon or used in connection with the operation of the CTF under the current or any future taxation or assessment system or modification of, supplement to, or substitute for such system (including all taxes and assessments for public improvements or any other governmental purpose). The term "Real Estate Taxes" shall not include any income, franchise, transfer, inheritance, capital stock or other tax unless, due to a future change in the method of taxation, such a tax shall be levied against Lessor in substitution for or in lieu of any tax which would otherwise constitute Real Estate Taxes, in which event such income, franchise, transfer, inheritance, capital stock or other tax shall be deemed to be included in Real Estate Taxes to the extent and only to that extent that such tax is ascertained to be in lieu of or a substitute for what were previously Real Estate Taxes; provided, that the amount of such income, franchise, transfer, inheritance, capital stock or other tax deemed to be included in the term Real Estate Taxes shall be determined as if the CTF building were the only asset of Lessor and as if the rent paid hereunder was the only income of the Lessor. No other tax that is in addition to or in lieu of present day real estate taxes shall be included in the term "Real Estate Taxes."

8.3    Utilities. During the term of the O&M Agreement, Lessor as Operator shall pay all charges for water, gas, heat, steam, electricity, telephone service and all other utilities delivered to the CTF. Upon termination of the O&M Agreement, the District shall assume direct responsibility for the payment of the utility charges specified in this Article 8.3.

**ARTICLE 9**
**INSURANCE AND INDEMNIFICATION**

9.1    Insurance. During the term of the O&M Agreement, the Lessor as Operator shall provide insurance coverage for the CTF as specified in the O&M Agreement. Upon termination of the O&M Agreement and this Lease, insurance relating to the CTF shall be the sole responsibility of the District, and Lessor shall have no obligation to procure insurance. Upon termination of the O&M Agreement and continuation of this Lease, Lessor shall, during the remaining Term of the Lease, purchase property insurance for the CTF conforming to the property insurance requirements set forth in Section 10.6 of the O&M Agreement, with Lessor as the

insured and the District named as an additional insured as their interests may appear. The Lessor shall bill the District for insurance premiums for insurance required by the preceding sentence, and payment by the District shall be due forty five (45) days after its receipt of a properly documented invoice for such insurance premiums.

9.2 <u>Indemnification</u>. The Lessor shall protect, defend, indemnify, save and hold harmless the District, its departments, agencies, boards and commissions, its officers, agents, servants, employees and volunteers from and against any and all claims, demands, expenses and liability arising out of acts or omissions of the Lessor, its agents, servants, subcontractors and employees (regardless of whether any damage resulting from Lessor's act, omission or default is caused in part by the District), and any and all costs, expenses and attorney's fees incurred as a result of any claim, demand or cause of action including, but not limited to, any and all claims arising from:

(a) any breach or default on the part of the Lessor in the performance of its duties and obligations under this Lease;

(b) any claims or losses arising from or related to services rendered by the Lessor, by any person or firm performing or supplying services, materials or supplies in connection with the performance of this Lease; and

(c) any failure of the Lessor, its officers, agents, or employees to observe the laws of the United States and the District of Columbia, including but not limited to labor laws and minimum wage laws.

This indemnification provision shall not be applicable to injury, death or damage to property arising exclusively from the negligent or intentional acts of the District, its officers, agents, servants or independent contractors (other than the Lessor) who are directly responsible to the District. The Lessor shall not waive, release, or otherwise forfeit any possible defense the District may have regarding claims arising from or made in connection with the operation of the CTF by the Lessor without the consent of the District. The Lessor shall preserve all such available defenses and cooperate with the District to make such defenses available to the maximum extent allowed by law.

In case any action or proceeding is brought against the District by reason of any such claim, the Lessor, upon notice from the District, shall defend against such action by counsel satisfactory to the District, unless such action or proceeding is defended against by counsel for any carrier of liability insurance provided for herein.

-10-

The Lessor's obligation to defend any claim or action provided for by this Article 9.2 shall not be affected by a claim that negligence of the District or any other indemnitee hereunder, caused or contributed to such claim or cause of action.

## ARTICLE 10
## MAINTENANCE AND REPAIR OF THE CTF

During the term of the O&M Agreement, the Lessor as Operator shall maintain the CTF in accordance with Section 6.1 of the O&M Agreement and shall make all necessary repairs and improvements in accordance with all applicable laws and regulations. Upon termination of the O&M Agreement, the District shall have sole responsibility for the maintenance of the CTF, and Lessor shall have no obligation with regard to such maintenance.

## ARTICLE 11
## ASSIGNMENT AND SUBLETTING

11.1    Assignment of the District's Interest. The District shall not assign, pledge or hypothecate this Lease, sublease the CTF or any portion thereof except to the United States or a department or agency of the Government of the District of Columbia, or encumber its leasehold interest. The District shall have the right to engage the Lessor as Operator, or, subject to the terms of the O&M Agreement, to engage other persons or entities to operate, or provide goods and services to, the CTF.

11.2    Assignment of Lessor's Interest. The Lessor may not assign to any person, all or any part of, or any interest (divided or undivided) in its right, title and interest in and to this Lease, the CTF, any other documents executed with respect to this Lease, or the Lease Payments without the District's prior written consent.

11.3    Effect of Assignment. Subject to the foregoing, this Lease inures to the benefit of and is binding upon the successors and permitted assigns of the parties hereto.

## ARTICLE 12
## DEFAULT AND REMEDIES

12.1    Default. The following events shall constitute an Event of Default under this Lease.

(a)    failure by the District to make a Lease Payment within thirty (30) calendar days after the due date thereof, except

where such failure is caused by an Event of Nonappropriation;

(b)    failure by the Lessor to construct and install the Improvements in accordance with the terms of this Lease;

(c)    a default of the Lessor as Operator under the O&M Agreement which is not cured within the time allowed therein;

(d)    failure by the District or the Lessor to observe and perform any covenant, condition, or agreement, on their respective parts to be observed or performed by it hereunder, other than as referred to in (a) or (b) above, which failure is not cured within 30 calendar days after written notice thereof is provided to the party in default by the other party hereto;

(e)    any material statement, representation, or warranty made by the Lessor in this Lease or in any writing delivered by the Lessor pursuant to or in connection with this Lease is false, misleading, or erroneous in any material respect;

(f)    the filing by the Lessor of a voluntary petition in bankruptcy, or failure by the Lessor promptly to lift any execution, garnishment, or attachment or adjudication of the Lessor as a bankrupt, or assignment by the Lessor for the benefit of creditors, or the entry by the Lessor into an agreement of composition with creditors, or the approval by a court of competent jurisdiction of a petition applicable to the Lessor in any proceedings instituted under the provisions of the Federal Bankruptcy Code, or under any similar Federal law or law of the District of Columbia which may hereafter be enacted;

(g)    any event which shall occur or any condition which shall exist the effect of which is to cause (i) more than $500,000 of aggregate indebtedness of the Lessor to become due prior to its stated due date, or (ii) a lien to be placed on the CTF or the Lessor's interest in the CTF, which is not released within sixty (60) days; or

(h)    a final judgment against the Lessor for an amount in excess of $500,000 shall be outstanding for any period of sixty (60) days or more from the date of its entry and shall not have been discharged in full or stayed pending appeal, and

-12-

a lien is placed on the CTF or the Lessor's interest in the CTF.

**12.2    Remedies of Lessor.**  Upon an Event of Default by the District, or upon the occurrence of an Event of Nonappropriation, the Lessor shall have the right, to the extent permitted by law, to require all future Lease Payments to be made in accordance with Exhibit C-2.

**12.3    Remedies on Event of Default of Lessor.**  Upon an Event of Default by the Lessor, the District shall have the right, at its option, to take one or any combination of the following remedial steps:

(a)    bring suit for specific performance requiring Lessor to complete construction and installation of the Improvements in accordance with the terms and provisions hereof;

(b)    upon the termination of the O&M Agreement for cause, make all future Lease Payments in accordance with Exhibit C-2;

(c)    take whatever action at law or in equity may appear necessary or desirable to enforce performance and observance of any other obligation, agreement, or covenant of the Lessor under this Lease; or

(d)    offset against amounts otherwise payable to Lessor the amount of any damages suffered by the District on account of such Event of Default or the amount expended by the District to overcome the effects of such Event of Default.

**12.4    Delay; Notice.**  No delay or omission to exercise any right or power accruing upon any Event of Default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.  In order to entitle any party to exercise any remedy reserved to it in this Lease, it shall not be necessary to give any notice, other than such notice as may specifically be required in this Lease.

**12.5    No Additional Waiver Impaired by One Waiver.**  In the event any provision contained in this Lease should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

**12.6    Remedies Are Cumulative.**  All rights, options and remedies contained in this Lease shall be construed and held to be cumulative, and no one of them shall be exclusive of the other, and the parties hereto shall have the right to pursue any one

or all of such remedies or any other remedy or relief which may be provided by law or equity, which has been granted by this Lease.

## ARTICLE 13
### CERTAIN OBLIGATIONS OF LESSOR

13.1    <u>Sale of Interest</u>.  The Lessor shall not sell, assign, pledge, encumber, hypothecate or transfer its interest in the CTF without the prior written consent of the District.  Any such assignment, pledge, hypothecation, encumbrance, transfer or conveyance without compliance with the proceeding sentence shall be void.

13.2    <u>Maintenance of Corporate Existence and Business</u>.  The Lessor shall at all time maintain its corporate existence and authority to transact business and remain in good standing in its jurisdiction of incorporation.  The Lessor shall maintain all licenses, permits, and franchises necessary for its businesses where the failure to so maintain might have a material adverse affect on the Lessor's ability to perform its obligations under this Lease.

13.3    <u>Business Activities; Indebtedness</u>.  Without the District's prior written consent, the Lessor shall not sell any CTF assets with a cumulative value in any one year in excess of $100,000, except as specifically contemplated by this Lease.  The Lessor shall not create, assume or permit to exist any indebtedness or lien on the CTF or any personal property located therein.

## ARTICLE 14
### LESSOR'S REPRESENTATIONS

The Lessor represents and warrants and covenants in connection with this Lease as follows:  The Lessor is a corporation duly organized and validly existing under the laws of Delaware.  The execution, delivery and performance by the Lessor of this Lease has been duly authorized by all necessary action on the part of the Lessor.  This Lease constitutes a legal, valid and binding obligation of the Lessor enforceable in accordance with its terms.   No further approval, consent, or withholding of objections is required from any government authority with respect to this Lease.  The entering into and performance of this Lease is not contrary to and does not violate any judgment, order, law or regulation or constitute a default by the Lessor under any other agreement or instrument.  There are no pending or threatened actions or proceedings before any court or administrative agency which will materially adversely affect the condition, business or operation of Lessor or the ability of Lessor to perform its obligations under this Lease.

## ARTICLE 15
## DAMAGE, DESTRUCTION AND CONDEMNATION

15.1    Damage, Destruction, Condemnation.  During the term of the O&M Agreement, the Lessor as Operator in accordance with Section 6.3 thereof, shall repair, rebuild or replace the CTF, as necessary, to restore it to its condition prior to any damage or loss.  Such work shall be performed in such a manner so as not to interfere with the primary mission or operation of the CTF.  The District shall have the right to approve all plans for the repair, rebuilding or replacement of the CTF prior to the commencement of any repair or construction and shall have the right to inspect the CTF during any period of such repair or construction.  The District shall be solely responsible for any damage or destruction occurring after the termination of the O&M Agreement, but shall have the right to receive and retain all proceeds of insurance obtained pursuant to Article 9.1.  If any federal, state or local government condemns the CTF in an exercise of its eminent domain powers, the taking shall be deemed a termination of this Agreement for cause.  Any payment received by the Lessor in connection with the taking shall be paid to the District.

15.2    Cooperation.  Lessor and the District shall cooperate in filing any proof of loss with respect to any insurance policy covering the casualties described in Article 15.1 hereof and in the prosecution or defense of any prospective or pending condemnation proceeding with respect to the CTF or any part thereof.  In no event will either party voluntarily settle, or consent to the settlement of, any proceeding arising out of any insurance claim or any prospective or pending condemnation proceeding with respect to the CTF or any part thereof without the written consent of the other party.

## ARTICLE 16
## THE DISTRICT'S REPRESENTATIONS

The District represents, warrants and covenants in connection with this Lease as follows:  The execution, delivery and performance by the District of this Lease has been duly authorized.  This Lease constitutes a legal, valid and binding obligation of the District enforceable in accordance with its terms.  No further approval, consent, or withholding of objections is required from any governmental authority with respect to this Lease.  The entering into and performance of this Lease is not contrary to and does not violate any judgment, order, law or regulation or constitute a default by the District under any other agreement or instrument.

## ARTICLE 17
## TRANSFER OF TITLE

Upon (a) payment of all amounts due to Lessor under this Lease, including, the Lease Payments or (b) exercise of the purchase option pursuant to Article 18 of this Lease and payment of all amounts due thereunder, all right title and interest of Lessor in and to the CTF shall revert to the District.

## ARTICLE 18
## PURCHASE OPTION

Upon thirty (30) days' prior written notice from the District to the Lessor, and provided that there is no Default by the District as defined in Article 12 of this Lease, then existing, the District shall have the right to purchase the Lessor's rights in the CTF on any Lease Payment Date by paying to the Lessor, on such date, the Lease Payment then due together with the Concluding Payment amount set forth opposite such date. Upon satisfaction by the District of such purchase conditions, the Lessor will transfer any and all of its right, title and interest in the CTF to the District pursuant to a special warranty deed.

## ARTICLE 19
## DISPUTE RESOLUTION

19.1   Contract Monitor.   The District shall appoint a representative (the "Contract Monitor") for this Lease who shall work for and be paid by the District. The Contract Monitor or other person(s) designated by the District shall be the official representative of the District with respect to matters related to the Lessor's compliance with the terms of this Lease.

19.1.1   Contract Monitor.   If the Contract Monitor determines that Lessor is not in compliance with this Lease, it shall notify the Lessor in writing of the non-compliance. The notification to the Lessor shall identify the provisions of this Lease which the Lessor is failing to meet. If the deficiencies do not constitute an Event of Default hereunder and so long as the District elects, the District and the Lessor shall utilize the procedures specified in this Section 19.1.1 for the resolution of the Contract Monitor's determination of deficiency. Within fifteen (15) days after receipt of the notification of the deficiencies, the Lessor shall notify the Contract Monitor in writing that the deficiency has been cured or shall propose a plan for correcting the deficiency. If the Contract Monitor and the

Lessor cannot agree on the nature of the deficiency or the method for correcting the deficiency, either the District or the Lessor may refer the matter for resolution by management as provided in Section 19.1.2 hereof.

19.1.2   <u>Management Resolution</u>.   The DOC's executive deputy director and the Lessor's vice president for operations shall be responsible for administering the management resolution procedures regarding claims with respect to a failure to comply with this Lease.   The DOC's executive deputy director and the Lessor's vice president for operations shall attempt to settle such claim.   If they are unable to resolve the claim within thirty (30) days after either party notifies the other that the claim has been referred for management resolution, either party may declare that an impasse has been reached.   Upon the declaration of an impasse, each party shall appoint a mediator within five (5) Business Days of the declaration of the impasse.   The mediators appointed by the District and the Lessor shall select a third mediator. If one of the Parties fails or refuses to appoint a mediator, the mediator appointed by the other party shall resolve the issue of the claimed deficiency.

19.1.3   <u>Mediation Process</u>.   In the absence of an agreement to the contrary by the District and the Lessor, the mediation process shall be conducted in accordance with the Center for Public Resources Model Mediation Procedure for Business Disputes.   The mediators shall conduct all hearings and meeting in Washington, D.C. and within thirty (30) days of their appointment the mediators shall notify the District and the Lessor in writing of their decision stating separately findings of fact and determinations of law.   The decision of the mediators can be appealed to a court of competent jurisdiction within the District of Columbia as to decisions of law but not as to findings of fact.

19.1.4   <u>Indemnification Payments</u>.   If the mediators determine there are deficiencies in the Lessor's performance, the Lessor shall be liable, at the District's option, for the indemnification payments provided for by Article 9.2 hereof in addition to any other amounts due hereunder.

19.1.5   <u>Continuation of Performance</u>.   The Lessor shall continue to discharge its obligations, and the District shall pay the

Lease Payments, in accordance with the terms of this Lease, during the pendency of the mediation process.

19.2    Right to Audit.  The District shall, subject to limitations provided by law with respect to rights of privacy, have the right to examine records of the Lessor and its subcontractors, related to the CTF, including without limitation, financial books and records and maintenance records in connection with performance of this Lease. Any contract between the Lessor and a subcontractor shall grant the District the right to audit the subcontractor's books and records under the same terms and conditions the District may audit the Lessor's books and records.  The provisions of this Section 19.2 shall not apply to a subcontractor for any year that the subcontractor receives payments of less than $450,000 for material and services provided in connection with this Lease.

## ARTICLE 20
## GENERAL PROVISIONS

20.1    Notices.  Except as otherwise specifically provided for in this Lease, all notices, demands, consents, approvals and communications between the Lessor and the District shall be in writing and shall be deemed sufficiently given if dispatched by registered or certified mail, postage prepaid, return receipt requested, or personally delivered to the addresses of the Lessor or the District as designated below or to other parties entitled to notice under this Lease and shall be deemed delivered, in the case of delivery by personal service at the time of delivery or, in the case of mailing as provided above, on the third Business Day after deposit into the United States mail. Such written notices, demands and communications shall be sent to the same manner to other addresses as either party may from time designate by mail as provided in this Article.

If to Lessor:  Corrections Corporation of America
102 Woodmont Boulevard, Suite 800
Nashville, TN  37205
Attention:  Vice President, Legal Affairs

If to the District:  Real Property Administration
District of Columbia Department of Administrative Services
441 Fourth Street, N.W., 7th Floor
Washington, D.C.  20001
Attention:  Administrator

Rejection, refusal to accept, or inability to deliver because of change in address of which no notice was given as provided herein, shall be deemed to be receipt of the notice sent.

20.2    _Time of the Essence_. Except as otherwise provided herein, time is of the essence with respect to the performance of each of the covenants and agreements contained in this Lease.

20.3    _Computation of Time_. The time in which any act provided by this Lease is to be done is computed by excluding the first day and including the last, unless the last day is a Saturday, Sunday or legal holiday under the laws of the District of Columbia, and then it is also excluded.

20.4    _Relationship of the Parties_. Nothing contained in this Lease and no acts of the Lessor or the District shall be deemed or construed to create the relationship of principal and agent, or of partnership, or of joint venture, or of any association among the Lessor and the District other than that of a landlord and tenant.

20.5    _Severability_. If any provision of this Lease shall be adjudged invalid, illegal or unenforceable by a court of competent jurisdiction, the remaining provisions of this Lease shall not be affected thereby, but this Lease shall be construed as if such invalid, illegal or unenforceable provisions had not been contained herein, and the remainder of this Lease shall be valid and enforceable to the fullest extent permitted by law.

20.6    _Binding Effect_. This Lease, and the terms, provisions, promises, covenants and conditions hereof, shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

20.7    _Entire Agreement_. This Lease embodies the entire agreement between the parties relative to the subject matter hereof. There are no oral or parole agreements existing between the parties relative to the subject matter hereof which are not expressly set forth herein. This Lease may be executed in duplicate originals, each of which is deemed to be an original.

20.8    _No Waiver_. No failure by either the Lessor or the District to insist upon the strict performance by the other of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition. No waiver of any breach shall affect or alter this Lease, but each and every covenant, condition, agreement, and term of this Lease shall continue in full force and effect with respect to any other than existing or subsequent breach. All waivers of the provisions of this Lease and all amendments hereto must be in writing and signed by the Lessor and the District, or their authorized agents.

20.9    _Interpretation and Definition_. The language in all parts of this Lease shall in all cases be simply construed according to its fair meaning and not strictly for or against the Lessor or the District.

20.10    _Memorandum of this Lease_.  At the request of either party, the Lessor and the District shall execute and the District shall deliver to the Recorder of Deeds for the District of Columbia for recordation on or after the Service Commencement Date the Memorandum of Lease, a copy of which is attached hereto as Exhibit D.  The District shall be responsible for all costs associated with the recordation of the Memorandum of Lease, including payment of the documentary transfer tax.

20.11    _Representation of Authority_.  The undersigned personally represent that they have full authority to act on behalf of and bind the Lessor and the District, respectively.

20.12    _Applicable Law_.  The laws of the District of Columbia, other than its choice of law provisions, shall govern the interpretation and enforcement of this Lease.

20.13    _Survival_.  The warranties and representations under this Lease shall survive the expiration or earlier termination of this Lease.

20.14    _Compliance_.  During the term of the O&M Agreement, the District shall be deemed to have complied fully with the terms and conditions of Articles 7, 8, 9 and 10 of this Lease.

20.15    _No Merger_.  The voluntary or other surrender of this Lease by the District, or a mutual cancellation thereof, shall not work a merger.

The Corrections Corporation of America, on this _____ day of _____, 1996, has caused this Lease to be signed by _____, its _____, and attested by its secretary, and its corporate seal to be affixed and does hereby appoint _____ its true and lawful attorney-in-fact to acknowledge and deliver this Lease as its act and deed.

The District of Columbia, on this _____ day of _____, 199_, has caused this Lease to be signed by _____, its _____, and attested by its secretary, and its corporate seal to be affixed and does hereby appoint _____ its true and lawful attorney-in-fact to acknowledge and deliver this Lease as its act and deed.

CORRECTIONS CORPORATION OF AMERICA, Lessor

ATTEST:

_____
Secretary

By:_____
Title: Chairman & CEO

[CORPORATE SEAL]

DISTRICT OF COLUMBIA
a Municipal Corporation, Lessee

ATTEST:

_____
Secretary

By:_____
Title:_____

\45196\011\LEASBACK.005

-21-

DISTRICT OF COLUMBIA  ss:

       I, _____, a Notary Public in and for the District of Columbia, do hereby certify that _____, who is personally well-known to me the person named as the attorney-in-fact for the District of Columbia, a party in the foregoing and annexed Lease, personally appeared before me in the aforesaid jurisdiction and as attorney-in-fact as aforesaid, acknowledged the same to be the act and deed of the District of Columbia.

       Given under my hand and seal this _____ day of _____, 199_.

[NOTARIAL SEAL]

My Commission Expires:

_____

                             _____
                             Notary Public

Approved as to Legal Sufficiency:

_____
Assistant Corporation Counsel, D.C.                        Date

DISTRICT OF COLUMBIA  ss:

I, _Billie Blanutt_ , a notary public in and for the above jurisdiction, do hereby certify that _Doctor R. Crants_ , _Chairman & CEO_ of Corrections Corporation of America, Lessor named in the foregoing and annexed Lease, personally appears before me, the said _Doctor R Crants_ , being personally well-known to me (or proved by the oath of credible witnesses to be) the person who executed the said Lease, and acknowledged the same to be his/her act and deed.

Given under my hand and seal this _2nd_ day of _September_, 199_.

[NOTARIAL SEAL]

My Commission Expires:

_My Commission Ends MARCH 21, 1998_

_Billie Blanutt_
Notary Public

EXHIBIT A

[Description of CTF Parcel and Personal Property Conveyed]

# EXHIBIT B

## List of Improvements to be Made by Lessor

1. CTF Improvements (As determined by District of Columbia on April 19, 1996.)
IAW RFP, Attachment 2, Minimum Repair/Renovation Work at the CTF

| | |
|---|---|
| HVAC/Mechanical Improvements | **$280,000** |
|     Air balancing - complete system | |
|     Energy Management system upgrade | |
|     Replacement of chiller coils - A Building | |
|     Install steam coils in air handling units - A Building | |
| | |
| Electrical Improvements | **$25,000** |
|     Replace electrical buss duct for feeder #14714 | |
| | |
| Plumbing Improvements | **$200,000** |
|     Correct toilet flushing problems - C Building | |
|     Replace shower pans with new shower units - C Building | |
| | |
| General - Other Improvements | **$345,000** |
|     Check operational condition of all equipment | |
|     Correct building settling problem | |
|     Repair roof leaks | |
|     Repair/reprogram elevator system | |
|     Recertify sprinkler/fire alarm system | |
| | |
| **TOTAL** | **$850,000** |

2. Additional CTF Improvements:

| | |
|---|---|
| Redesign/replace locking control system in Central Control and housing pods. Includes graphic controls in housing pods and touchscreen in Central Control. | **$1,000,000** |
| | |
| Add additional intercom stations; replace existing staff stations as required. Includes integration of intercom system into Control System. | **$200,000** |
| | |
| Add additional CCTV cameras and associated head-in equipment. | **$180,000** |
| | |
| Add additional conduit as required to support new electronic equipment. | **$500,000** |

| | |
|---|---|
| Add steel crash gate barriers and sliding doors to further separate inmate activities throughout the facility. | $200,000 |
| Repair/replace security hardware as required to properly coordinate operation in conjunction with the Control System. | $250,000 |
| Replace security glass to upgrade level of protection at key inmate locations. | $150,000 |
| Add additional barrier improvements throughout the facility at vertical chase locations. | $300,000 |
| General Conditions | $220,000 |
| **Total** | **$3,000,000** |

## EXHIBIT C-1

## LEASE PAYMENT SCHEDULE

The Lease Payments shall be in the amounts and shall be payable at the times set forth below unless there has been a termination of the O&M Agreement which is treated as a termination for cause pursuant to the O&M Agreement. In the event of such termination, the District shall deliver to Lessor a revised Lease Payment Schedule within ninety (90) days after the termination date. The revised Lease Payment Schedule shall recalculate the Lease Payments in the manner provided in Exhibit C-2.

| Lease Payment Date | | Lease Payment | Concluding Payment |
|---|---|---|---|
| Month | 0 | 0.00 | 55,850,000.00 |
| | 1 | 232,708.33 | 55,617,291.67 |
| | 2 | 232,708.33 | 55,384,583.34 |
| | 3 | 232,708.33 | 55,151,875.01 |
| | 4 | 232,708.33 | 54,919,166.68 |
| | 5 | 232,708.33 | 54,686,458.35 |
| | 6 | 232,708.33 | 54,453,750.02 |
| | 7 | 232,708.33 | 54,221,041.69 |
| | 8 | 232,708.33 | 53,988,333.36 |
| | 9 | 232,708.33 | 53,755,625.03 |
| | 10 | 232,708.33 | 53,522,916.70 |
| | 11 | 232,708.33 | 53,290,208.37 |
| | 12 | 232,708.33 | 53,057,500.04 |
| | 13 | 232,708.33 | 52,824,791.71 |
| | 14 | 232,708.33 | 52,592,083.38 |
| | 15 | 232,708.33 | 52,359,375.05 |
| | 16 | 232,708.33 | 52,126,666.72 |
| | 17 | 232,708.33 | 51,893,958.39 |
| | 18 | 232,708.33 | 51,661,250.06 |
| | 19 | 232,708.33 | 51,428,541.73 |
| | 20 | 232,708.33 | 51,195,833.40 |
| | 21 | 232,708.33 | 50,963,125.07 |
| | 22 | 232,708.33 | 50,730,416.74 |
| | 23 | 232,708.33 | 50,497,708.41 |
| | 24 | 232,708.33 | 50,265,000.08 |
| | 25 | 232,708.33 | 50,032,291.75 |
| | 26 | 232,708.33 | 49,799,583.42 |
| | 27 | 232,708.33 | 49,566,875.09 |
| | 28 | 232,708.33 | 49,334,166.76 |

| Lease Payment Date | Lease Payment | Concluding Payment |
|---|---|---|
| 29 | 232,708.33 | 49,101,458.43 |
| 30 | 232,708.33 | 48,868,750.10 |
| 31 | 232,708.33 | 48,636,041.77 |
| 32 | 232,708.33 | 48,403,333.44 |
| 33 | 232,708.33 | 48,170,625.11 |
| 34 | 232,708.33 | 47,937,916.78 |
| 35 | 232,708.33 | 47,705,208.45 |
| 36 | 232,708.33 | 47,472,500.12 |
| 37 | 232,708.33 | 47,239,791.79 |
| 38 | 232,708.33 | 47,007,083.46 |
| 39 | 232,708.33 | 46,774,375.13 |
| 40 | 232,708.33 | 46,541,666.80 |
| 41 | 232,708.33 | 46,308,958.47 |
| 42 | 232,708.33 | 46,076,250.14 |
| 43 | 232,708.33 | 45,843,541.81 |
| 44 | 232,708.33 | 45,610,833.48 |
| 45 | 232,708.33 | 45,378,125.15 |
| 46 | 232,708.33 | 45,145,416.82 |
| 47 | 232,708.33 | 44,912,708.49 |
| 48 | 232,708.33 | 44,680,000.16 |
| 49 | 232,708.33 | 44,447,291.83 |
| 50 | 232,708.33 | 44,214,583.50 |
| 51 | 232,708.33 | 43,981,875.17 |
| 52 | 232,708.33 | 43,749,166.84 |
| 53 | 232,708.33 | 43,516,458.51 |
| 54 | 232,708.33 | 43,283,750.18 |
| 55 | 232,708.33 | 43,051,041.85 |
| 56 | 232,708.33 | 42,818,333.52 |
| 57 | 232,708.33 | 42,585,625.19 |
| 58 | 232,708.33 | 42,352,916.86 |
| 59 | 232,708.33 | 42,120,208.53 |
| 60 | 232,708.33 | 41,887,500.20 |
| 61 | 232,708.33 | 41,654,791.87 |
| 62 | 232,708.33 | 41,422,083.54 |
| 63 | 232,708.33 | 41,189,375.21 |
| 64 | 232,708.33 | 40,956,666.88 |
| 65 | 232,708.33 | 40,723,958.55 |
| 66 | 232,708.33 | 40,491,250.22 |
| 67 | 232,708.33 | 40,258,541.89 |
| 68 | 232,708.33 | 40,025,833.56 |
| 69 | 232,708.33 | 39,793,125.23 |

| Lease Payment Date | Lease Payment | Concluding Payment |
|---|---|---|
| 70 | 232,708.33 | 39,560,416.90 |
| 71 | 232,708.33 | 39,327,708.57 |
| 72 | 232,708.33 | 39,095,000.24 |
| 73 | 232,708.33 | 38,862,291.91 |
| 74 | 232,708.33 | 38,629,583.58 |
| 75 | 232,708.33 | 38,396,875.25 |
| 76 | 232,708.33 | 38,164,166.92 |
| 77 | 232,708.33 | 37,931,458.59 |
| 78 | 232,708.33 | 37,698,750.26 |
| 79 | 232,708.33 | 37,466,041.93 |
| 80 | 232,708.33 | 37,233,333.60 |
| 81 | 232,708.33 | 37,000,625.27 |
| 82 | 232,708.33 | 36,767,916.94 |
| 83 | 232,708.33 | 36,535,208.61 |
| 84 | 232,708.33 | 36,302,500.28 |
| 85 | 232,708.33 | 36,069,791.95 |
| 86 | 232,708.33 | 35,837,083.62 |
| 87 | 232,708.33 | 35,604,375.29 |
| 88 | 232,708.33 | 35,371,666.96 |
| 89 | 232,708.33 | 35,138,958.63 |
| 90 | 232,708.33 | 34,906,250.30 |
| 91 | 232,708.33 | 34,673,541.97 |
| 92 | 232,708.33 | 34,440,833.64 |
| 93 | 232,708.33 | 34,208,125.31 |
| 94 | 232,708.33 | 33,975,416.98 |
| 95 | 232,708.33 | 33,742,708.65 |
| 96 | 232,708.33 | 33,510,000.32 |
| 97 | 232,708.33 | 33,277,291.99 |
| 98 | 232,708.33 | 33,044,583.66 |
| 99 | 232,708.33 | 32,811,875.33 |
| 100 | 232,708.33 | 32,579,167.00 |
| 101 | 232,708.33 | 32,346,458.67 |
| 102 | 232,708.33 | 32,113,750.34 |
| 103 | 232,708.33 | 31,881,042.01 |
| 104 | 232,708.33 | 31,648,333.68 |
| 105 | 232,708.33 | 31,415,625.35 |
| 106 | 232,708.33 | 31,182,917.02 |
| 107 | 232,708.33 | 30,950,208.69 |
| 108 | 232,708.33 | 30,717,500.36 |
| 109 | 232,708.33 | 30,484,792.03 |

| Lease Payment Date | Lease Payment | Concluding Payment |
|---|---|---|
| 110 | 232,708.33 | 30,252,083.70 |
| 111 | 232,708.33 | 30,019,375.37 |
| 112 | 232,708.33 | 29,786,667.04 |
| 113 | 232,708.33 | 29,553,958.71 |
| 114 | 232,708.33 | 29,321,250.38 |
| 115 | 232,708.33 | 29,088,542.05 |
| 116 | 232,708.33 | 28,855,833.72 |
| 117 | 232,708.33 | 28,623,125.39 |
| 118 | 232,708.33 | 28,390,417.06 |
| 119 | 232,708.33 | 28,157,708.73 |
| 120 | 232,708.33 | 27,925,000.40 |
| 121 | 232,708.33 | 27,692,292.07 |
| 122 | 232,708.33 | 27,459,583.74 |
| 123 | 232,708.33 | 27,226,875.41 |
| 124 | 232,708.33 | 26,994,167.08 |
| 125 | 232,708.33 | 26,761,458.75 |
| 126 | 232,708.33 | 26,528,750.42 |
| 127 | 232,708.33 | 26,296,042.09 |
| 128 | 232,708.33 | 26,063,333.76 |
| 129 | 232,708.33 | 25,830,625.43 |
| 130 | 232,708.33 | 25,597,917.10 |
| 131 | 232,708.33 | 25,365,208.77 |
| 132 | 232,708.33 | 25,132,500.44 |
| 133 | 232,708.33 | 24,899,792.11 |
| 134 | 232,708.33 | 24,667,083.78 |
| 135 | 232,708.33 | 24,434,375.45 |
| 136 | 232,708.33 | 24,201,667.12 |
| 137 | 232,708.33 | 23,968,958.79 |
| 138 | 232,708.33 | 23,736,250.46 |
| 139 | 232,708.33 | 23,503,542.13 |
| 140 | 232,708.33 | 23,270,833.80 |
| 141 | 232,708.33 | 23,038,125.47 |
| 142 | 232,708.33 | 22,805,417.14 |
| 143 | 232,708.33 | 22,572,708.81 |
| 144 | 232,708.33 | 22,340,000.48 |
| 145 | 232,708.33 | 22,107,292.15 |
| 146 | 232,708.33 | 21,874,583.82 |
| 147 | 232,708.33 | 21,641,875.49 |
| 148 | 232,708.33 | 21,409,167.16 |

| Lease Payment Date | Lease Payment | Concluding Payment |
|---|---|---|
| 149 | 232,708.33 | 21,176,458.83 |
| 150 | 232,708.33 | 20,943,750.50 |
| 151 | 232,708.33 | 20,711,042.17 |
| 152 | 232,708.33 | 20,478,333.84 |
| 153 | 232,708.33 | 20,245,625.51 |
| 154 | 232,708.33 | 20,012,917.18 |
| 155 | 232,708.33 | 19,780,208.85 |
| 156 | 232,708.33 | 19,547,500.52 |
| 157 | 232,708.33 | 19,314,792.19 |
| 158 | 232,708.33 | 19,082,083.86 |
| 159 | 232,708.33 | 18,849,375.53 |
| 160 | 232,708.33 | 18,616,667.20 |
| 161 | 232,708.33 | 18,383,958.87 |
| 162 | 232,708.33 | 18,151,250.54 |
| 163 | 232,708.33 | 17,918,542.21 |
| 164 | 232,708.33 | 17,685,833.88 |
| 165 | 232,708.33 | 17,453,125.55 |
| 166 | 232,708.33 | 17,220,417.22 |
| 167 | 232,708.33 | 16,987,708.89 |
| 168 | 232,708.33 | 16,755,000.56 |
| 169 | 232,708.33 | 16,522,292.23 |
| 170 | 232,708.33 | 16,289,583.90 |
| 171 | 232,708.33 | 16,056,875.57 |
| 172 | 232,708.33 | 15,824,167.24 |
| 173 | 232,708.33 | 15,591,458.91 |
| 174 | 232,708.33 | 15,358,750.58 |
| 175 | 232,708.33 | 15,126,042.25 |
| 176 | 232,708.33 | 14,893,333.92 |
| 177 | 232,708.33 | 14,660,625.59 |
| 178 | 232,708.33 | 14,427,917.26 |
| 179 | 232,708.33 | 14,195,208.93 |
| 180 | 232,708.33 | 13,962,500.60 |
| 181 | 232,708.33 | 13,729,792.27 |
| 182 | 232,708.33 | 13,497,083.94 |
| 183 | 232,708.33 | 13,264,375.61 |
| 184 | 232,708.33 | 13,031,667.28 |
| 185 | 232,708.33 | 12,798,958.95 |
| 186 | 232,708.33 | 12,566,250.62 |
| 187 | 232,708.33 | 12,333,542.29 |
| 188 | 232,708.33 | 12,100,833.96 |
| 189 | 232,708.33 | 11,868,125.63 |

| Lease Payment Date | Lease Payment | Concluding Payment |
|---|---|---|
| 190 | 232,708.33 | 11,635,417.30 |
| 191 | 232,708.33 | 11,402,708.97 |
| 192 | 232,708.33 | 11,170,000.64 |
| 193 | 232,708.33 | 10,937,292.31 |
| 194 | 232,708.33 | 10,704,583.98 |
| 195 | 232,708.33 | 10,471,875.65 |
| 196 | 232,708.33 | 10,239,167.32 |
| 197 | 232,708.33 | 10,006,458.99 |
| 198 | 232,708.33 | 9,773,750.66 |
| 199 | 232,708.33 | 9,541,042.33 |
| 200 | 232,708.33 | 9,308,334.00 |
| 201 | 232,708.33 | 9,075,625.67 |
| 202 | 232,708.33 | 8,842,917.34 |
| 203 | 232,708.33 | 8,610,209.01 |
| 204 | 232,708.33 | 8,377,500.68 |
| 205 | 232,708.33 | 8,144,792.35 |
| 206 | 232,708.33 | 7,912,084.02 |
| 207 | 232,708.33 | 7,679,375.69 |
| 208 | 232,708.33 | 7,446,667.36 |
| 209 | 232,708.33 | 7,213,959.03 |
| 210 | 232,708.33 | 6,981,250.70 |
| 211 | 232,708.33 | 6,748,542.37 |
| 212 | 232,708.33 | 6,515,834.04 |
| 213 | 232,708.33 | 6,283,125.71 |
| 214 | 232,708.33 | 6,050,417.38 |
| 215 | 232,708.33 | 5,817,709.05 |
| 216 | 232,708.33 | 5,585,000.72 |
| 217 | 232,708.33 | 5,352,292.39 |
| 218 | 232,708.33 | 5,119,584.06 |
| 219 | 232,708.33 | 4,886,875.73 |
| 220 | 232,708.33 | 4,654,167.40 |
| 221 | 232,708.33 | 4,421,459.07 |
| 222 | 232,708.33 | 4,188,750.74 |
| 223 | 232,708.33 | 3,956,042.41 |
| 224 | 232,708.33 | 3,723,334.08 |
| 225 | 232,708.33 | 3,490,625.75 |
| 226 | 232,708.33 | 3,257,917.42 |
| 227 | 232,708.33 | 3,025,209.09 |
| 228 | 232,708.33 | 2,792,500.76 |



| Lease Payment Date | Lease Payment | Concluding Payment |
|---|---|---|
| 229 | 232,708.33 | 2,559,792.43 |
| 230 | 232,708.33 | 2,327,084.10 |
| 231 | 232,708.33 | 2,094,375.77 |
| 232 | 232,708.33 | 1,861,667.44 |
| 233 | 232,708.33 | 1,628,959.11 |
| 234 | 232,708.33 | 1,396,250.78 |
| 235 | 232,708.33 | 1,163,542.45 |
| 236 | 232,708.33 | 930,834.12 |
| 237 | 232,708.33 | 698,125.79 |
| 238 | 232,708.33 | 465,417.46 |
| 239 | 232,708.33 | 252,709.13 |
| 240 | 232,708.33 | 0.80 |

EXHIBIT C-2

Within ninety (90) days after termination of the O&M Agreement, the District shall deliver to the Lessor a revised Lease Payment Schedule calculating the Lease Payments as the amount necessary to pay in equal installments, with interest at 100 basis points over the then current rate on U.S. Treasury notes of comparable maturity, the remaining unpaid Lease Payments listed on Exhibit C-1 hereto. The remaining Lease Payments will be paid over a term of fifteen years if the termination of the O&M Agreement occurs during the first five years after the Service Commencement Date; ten years if the termination occurs during the second five years after the Service Commencement Date; and over the remaining original Lease Term if termination occurs during the last ten years after the Service Commencement Date. The first recalculated Lease Payment shall be due on the first Lease Payment Date following delivery of the revised Lease Payment Schedule to the Lessor.



RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

    McDermott, Will & Emery
    1850 K Street, N.W.
    Washington, D.C. 20006
    Attention: Thomas M. Ingoldsby

---

(SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY.)

### EXHIBIT D

### MEMORANDUM OF LEASE

    This Memorandum of Lease is made as of _____ __, 1996 between the Corrections Corporation of America, a Delaware corporation ("Lessor") and the Government of the District of Columbia, Department of Corrections (the "District"), who agree as follows:

1.    The Lessor hereby leases to the District and the District hereby hires from the Lessor that certain building (the "CTF") located on the real property described in Exhibit ___ attached hereto for a term of twenty (20) years commencing on the date hereof on the terms, conditions and provisions of that certain Lease Agreement dated as of _____ __, 1996 (the "Lease"), which provisions are incorporated into this Memorandum of Lease by this reference.

2.    Neither the Lessor nor the District may encumber the CTF by a mortgage, deed of trust, lien or any other device. The District shall not, by operation of law or otherwise, sell, assign, sublease, lease or otherwise transfer, dispose of or convey its interest in the CTF or the leasehold estate except as permitted by the Lease.

3.    The District has a reversionary interest in the CTF and an option to purchase the CTF prior to expiration of the Lease.

4.    This Memorandum of Lease is prepared for the purposes of recordation and in no way modifies or otherwise affects the terms, conditions and provisions of the Lease.

\45196\011\LEASBACK.005         D-1

"Lessor"

CORRECTIONS CORPORATION OF AMERICA

By:_____
Its:_____

"District"

[CORPORATE SEAL]

DISTRICT OF COLUMBIA
a Municipal Corporation

ATTEST:

_____
     Secretary

By:_____
Title:_____

DISTRICT OF COLUMBIA  ss:

    I, _____, a Notary Public in and for the District of Columbia, do hereby certify that _____ _____, who is personally well-known to me the person named as the attorney-in-fact for the District of Columbia, a party in the foregoing and annexed Lease, personally appeared before me in the aforesaid jurisdiction and as attorney-in-fact as aforesaid, acknowledged the same to be the act and deed of the District of Columbia.

    Given under my hand and seal this _____ day of _____, 199_.

[NOTARIAL SEAL]

My Commission Expires:

_____          _____
                         Notary Public

Approved as to Legal Sufficiency:

_____          _____
Assistant Corporation Counsel, D.C.              Date

\45196\011\LEASBACK.005          D-2

DISTRICT OF COLUMBIA  ss:

     I, _____, a notary public in and for the above jurisdiction, do hereby certify that _____ _____, _____ of Corrections Corporation of America, party to the foregoing and annexed Lease, personally appears before me, the said _____, being personally well-known to me (or proved by the oath of credible witnesses to be) the person who executed the said Lease, and acknowledged the same to be his/her act and deed.

     Given under my hand and seal this _____ day of _____, 199_.


[NOTARIAL SEAL]

My Commission Expires:


_____          _____
                                                           Notary Public


\45196\011\LEASBACK.005          D-3



RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

    McDermott, Will & Emery
    1850 K Street, N.W.
    Washington, D.C. 20006
    Attention: Thomas M. Ingoldsby

_____

(SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY.)

## MEMORANDUM OF LEASE

This Memorandum of Lease is made as of January 30, 1997 between the Corrections Corporation of America, a Delaware corporation ("Lessor") and the Government of the District of Columbia, Department of Corrections (the "District"), who agree as follows:



1.    The Lessor hereby leases to the District and the District hereby hires from the Lessor that certain building (the "CTF") located on the real property described in Exhibit A attached hereto for a term of twenty (20) years on the terms, conditions and provisions of that certain Lease Agreement dated as of January 30, 1997 (the "Lease"), which provisions are incorporated into this Memorandum of Lease by this reference.

2.    Neither the Lessor nor the District may encumber the CTF by a mortgage, deed of trust, lien or any other device. The District shall not, by operation of law or otherwise, sell, assign, sublease, lease or otherwise transfer, dispose of or convey its interest in the CTF or the leasehold estate except as permitted by the Lease.

3.    The District has a reversionary interest in the CTF and an option to purchase the CTF prior to expiration of the Lease.

4.    This Memorandum of Lease is prepared for the purposes of recordation and in no way modifies or otherwise affects the terms, conditions and provisions of the Lease.

"Lessor"

CORRECTIONS CORPORATION OF AMERICA

By: _____

Its: _____

"District"

[CORPORATE SEAL]

DISTRICT OF COLUMBIA
a Municipal Corporation

ATTEST:

By: _____

Title: Interim Director
_____
Secretary

DISTRICT OF COLUMBIA  ss:

I, _Phyllis E. Anderson_, a Notary Public in and for the District of Columbia, do hereby certify that _Dallas L. Evans_, who is personally well-known to me the person named as the attorney-in-fact for the District of Columbia, a party in the foregoing and annexed Memorandum of Lease, personally appeared before me in the aforesaid jurisdiction and as attorney-in-fact as aforesaid, acknowledged the same to be the act and deed of the District of Columbia.

Given under my hand and seal this _29th_ day of January, 1997.

[NOTARIAL SEAL]

My Commission Expires:

_9-15-98_

_____
Notary Public

Approved as to Legal Sufficiency:

_____
Assistant Corporation Counsel, D.C.

_1/29/97_
Date

STATE OF TENNESSEE )
 )ss:
COUNTY OF _Davidson_ )

I, _Billie Blansett_ , a notary public in and for the above jurisdiction, do hereby certify that _Doctor R. Crants_ , Chairman and CEO of Corrections Corporation of America, party to the foregoing and annexed Memorandum of Lease, personally appeared before me, the said _Doctor R. Crants_ being personally well-known to me (or proved by the oath of credible witnesses to be) the person who executed the said Memorandum of Lease, and acknowledged the same to be his/her act and deed.

Given under my hand and seal this _30th_ day of January, 1997.

[NOTARIAL SEAL]

My Commission Expires:

MISSION ENDS MARCH 21, 1998              _Billie Blansett_
                                          Notary Public

EXHIBIT A

For part of Lot 800, Square E-1112, herein described as follows:

Beginning at a point on the north line of G Street, S.E., distant due east, 206.0 feet from the point of intersection of the east line of 19th Street, S.E., with the said north line of G Street, S.E., and proceeds the nineteen (19) following courses and distances:

1. due north, 478.33 feet;
2. due east, 61.18 feet;
3. N 44 degrees 18 minutes 36 seconds E, 65.0 feet;
4. N 62 degrees 30 minutes 18 seconds E, 40.0 feet;
5. N 44 degrees 18 minutes 36 seconds E, 12.0 feet;
6. S 89 degrees 30 minutes 11 seconds E, 13.0 feet;
7. N 44 degrees 18 minutes 36 seconds E, 70.0 feet;
8. S 45 degrees 41 minutes 24 seconds E, 10.0 feet;
9. N 44 degrees 18 minutes 36 seconds E, 50.0 feet;
10. S 45 degrees 41 minutes 24 seconds E, 15.0 feet;
11. N 44 degrees 18 minutes 36 seconds E, 149.50 feet;
12. S 62 degrees 30 minutes E, 475.0 feet;
13. S 27 degrees 30 minutes W, 25.0 feet;
14. S 79 degrees 39 minutes W, 90.77 feet;
15. due west, 17.0 feet;
16. due south, 120.0 feet;
17. S 36 degrees 43 minutes 28 seconds W, 55.33 feet;
18. due south, 305.0 feet;
19. due west, 640.0 feet to the point of beginning, containing 406702.56 square feet or 9.34 acres.

## QUITCLAIM DEED FOR A TERM OF YEARS

THIS QUITCLAIM DEED FOR A TERM OF YEARS is executed this
30 day of January, 1997, by the District of Columbia, a
municipal corporation (hereafter called "the Grantor"), to
Corrections Corporation of America, a corporation formed under
the laws of the State of Delaware, whose address is 102 Woodmont
Boulevard, Nashville, Tennessee 37205 (hereafter called "the
Grantee").

WHEREAS, the Grantor constructed a building, known as the
Correctional Treatment Facility (hereafter called "the CTF"), on
certain land owned by the United States of America and consisting
of a portion of Lot 800 in Square E-1112 in the District of
Columbia, which portion of land (hereafter called "the Land") is
more fully described in Exhibit A hereto; and

WHEREAS, on January 27, 1997, the Surveyor of the District
of Columbia accepted and approved for recordation an
administrative transfer of jurisdiction over the Land by the
United States of America, acting by and through the General
Services Administration, to the Grantor pursuant to 40 U.S.C.
§ 122 and D.C. Code § 8-111; and

WHEREAS, the Grantor wishes to transfer to the Grantee,
subject to the limitations set forth in this instrument, such
rights as the Grantor may have in the CTF, for a term of years as
set forth herein.

NOW, THEREFORE, THIS DEED WITNESSETH:  That the Grantor, for
due consideration, the receipt and sufficiency of which is hereby
acknowledged, does hereby remise, release, and quitclaim unto the
said Grantee for a term of years, commencing on the date hereof
and expiring on the earlier of (a) twenty-one years after the
date hereof, or (b) the last day of the calendar month in which
the last Lease Payment is made pursuant to the Lease defined in
item 2 below, all the right, title, and interest that the said
Grantor has in and to the CTF, but subject to the following:

    1.    all easements, covenants, restrictions, and
reservations of record;

    2.    all rights of the Grantor as lessee of the CTF
under that certain Lease Agreement by and between the
Grantee and the Grantor (hereafter called "the Lease");

    3.    reversion to the Grantor upon expiration of the
term of years set forth herein and as otherwise provided
for in Article 17 of the Lease; and

    4.    the obligation to consult with the National
Capital Planning Commission with respect to any plans for

## EXHIBIT A

For part of Lot 800, Square E-1112, herein described as follows:

Beginning at a point on the north line of G Street, S.E., distant due east, 206.0 feet from the point of intersection of the east line of 19th Street, S.E., with the said north line of G Street, S.E., and proceeds the nineteen (19) following courses and distances:

1. due north, 478.33 feet;
2. due east, 61.18 feet;
3. N 44 degrees 18 minutes 36 seconds E, 65.0 feet;
4. N 62 degrees 30 minutes 18 seconds E, 40.0 feet;
5. N 44 degrees 18 minutes 36 seconds E, 12.0 feet;
6. S 89 degrees 30 minutes 11 seconds E, 13.0 feet;
7. N 44 degrees 18 minutes 36 seconds E, 70.0 feet;
8. S 45 degrees 41 minutes 24 seconds E, 10.0 feet;
9. N 44 degrees 18 minutes 36 seconds E, 50.0 feet;
10. S 45 degrees 41 minutes 24 seconds E, 15.0 feet;
11. N 44 degrees 18 minutes 36 seconds E, 149.50 feet;
12. S 62 degrees 30 minutes E, 475.0 feet;
13. S 27 degrees 30 minutes W, 25.0 feet;
14. S 23 degrees 39 minutes W, 90.77 feet;
15. due west, 17.0 feet;
16. due south, 120.0 feet;
17. S 36 degrees 43 minutes 28 seconds W, 55.33 feet;
18. due south, 305.0 feet;
19. due west, 640.0 feet to the point of beginning, containing 406702.56 square feet or 9.34 acres.



## QUITCLAIM DEED FOR A TERM OF YEARS

THIS QUITCLAIM DEED FOR A TERM OF YEARS is executed this 30 day of January, 1997, by the District of Columbia, a municipal corporation (hereafter called "the Grantor"), to Corrections Corporation of America, a corporation formed under the laws of the State of Delaware, whose address is 102 Woodmont Boulevard, Nashville, Tennessee 37205 (hereafter called "the Grantee").

WHEREAS, the Grantor constructed a building, known as the Correctional Treatment Facility (hereafter called "the CTF"), on certain land owned by the United States of America and consisting of a portion of Lot 800 in Square E-1112 in the District of Columbia, which portion of land (hereafter called "the Land") is more fully described in Exhibit A hereto; and

WHEREAS, on January 27, 1997, the Surveyor of the District of Columbia accepted and approved for recordation an administrative transfer of jurisdiction over the Land by the United States of America, acting by and through the General Services Administration, to the Grantor pursuant to 40 U.S.C. § 122 and D.C. Code § 8-111; and

WHEREAS, the Grantor wishes to transfer to the Grantee, subject to the limitations set forth in this instrument, such rights as the Grantor may have in the CTF, for a term of years as set forth herein.

NOW, THEREFORE, THIS DEED WITNESSETH:  That the Grantor, for due consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby remise, release, and quitclaim unto the said Grantee for a term of years, commencing on the date hereof and expiring on the earlier of (a) twenty-one years after the date hereof, or (b) the last day of the calendar month in which the last Lease Payment is made pursuant to the Lease defined in item 2 below, all the right, title, and interest that the said Grantor has in and to the CTF, but subject to the following:

1.    all easements, covenants, restrictions, and reservations of record;

2.    all rights of the Grantor as lessee of the CTF under that certain Lease Agreement by and between the Grantee and the Grantor (hereafter called "the Lease");

3.    reversion to the Grantor upon expiration of the term of years set forth herein and as otherwise provided for in Article 17 of the Lease; and

4.    the obligation to consult with the National Capital Planning Commission with respect to any plans for

future construction or site developments resulting in changes to the height, bulk and massing, fenestration or other exterior features of the CTF that would affect its character, in accordance with Section 5(a) of the National Capital Planning Act of 1952, as amended.

TO HAVE AND TO HOLD the same, for the term of years specified herein, together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity, and claim whatsoever of the Grantor, either in law or equity.

IN WITNESS WHEREOF, the Mayor of the District of Columbia, having first considered and approved the foregoing Quitclaim Deed for a Term of Years, has directed the execution thereof in the name of the District of Columbia by the Secretary of the District of Columbia who has on the date in the year hereinabove written, set her hand and affixed the seal of the District of Columbia under authority of the act of Congress entitled "An Act to Relieve the Commissioners of Certain Ministerial Duties", approved February 11, 1932, (D.C. Code, Section 1-303, 1987).

DISTRICT OF COLUMBIA
(a municipal corporation)

ATTEST:

~~Bernard S. Thomas~~

By: ~~Kathleen Jo Arnold~~

Secretary of the District of
Columbia

APPROVED AS TO LEGAL SUFFICIENCY:

By: ~~Edward Wink~~  1/23/97
Assistant Corporation Counsel

DISTRICT OF COLUMBIA, ss:

I, _Patricia M. Byrams_ , a Notary Public in and for the District of Columbia, do certify that _KATHLEEN E. ARNOLD_ personally appeared before me in the said District, the said Secretary of the District of Columbia, being personally well known to me as the person who executed the foregoing and annexed Quitclaim Deed for a Term of Years, and acknowledged the same to be the act and deed of the District of Columbia.

Give under my hand and official seal this _29th_ day of _January_ , 1997 A.D.

_Patricia M. Byrams_
Notary Public

My Commission Expires:

_5-14-99_

\45196\011\QUITDEED.009                                    - 3 -

EXHIBIT A

For part of Lot 800, Square E-1112, herein described as follows:

Beginning at a point on the north line of G Street, S.E., distant due east, 206.0 feet from the point of intersection of the east line of 19th Street, S.E., with the said north line of G Street, S.E., and proceeds the nineteen (19) following courses and distances:

1.   due north, 478.33 feet;
2.   due east, 61.18 feet;
3.   N 44 degrees 18 minutes 36 seconds E, 65.0 feet;
4.   N 62 degrees 30 minutes 18 seconds E, 40.0 feet;
5.   N 44 degrees 18 minutes 36 seconds E, 12.0 feet;
6.   S 89 degrees 30 minutes 11 seconds E, 13.0 feet;
7.   N 44 degrees 18 minutes 36 seconds E, 70.0 feet;
8.   S 45 degrees 41 minutes 24 seconds E, 10.0 feet;
9.   N 44 degrees 18 minutes 36 seconds E, 50.0 feet;
10.  S 45 degrees 41 minutes 24 seconds E, 15.0 feet;
11.  N 44 degrees 18 minutes 36 seconds E, 149.50 feet;
12.  S 62 degrees 30 minutes E, 475.0 feet;
13.  S 27 degrees 30 minutes W, 25.0 feet;
14.  S 79 degrees 39 minutes W, 90.77 feet;
15.  due west, 17.0 feet;
16.  due south, 120.0 feet;
17.  S 36 degrees 43 minutes 28 seconds W, 55.33 feet;
18.  due south, 305.0 feet;
19.  due west, 640.0 feet to the point of beginning, containing 406702.56 square feet or 9.34 acres.

**CORRECTIONAL TREATMENT FACILITY & CORRECTION DETENSION FACILITY STEAM SUPPLY**

| YEAR | POUNDS OF STEAM SUPPLIED | CTF ALLOCATION | CDF ALLOCATION | | |
|---|---|---|---|---|---|
| 2006 | 16,306,194 | 7,789,518 | 8,516,676 | | |
| 2005 | 29,436,509 | 14,061,910 | 15,374,599 | | |
| 2004 | 52,427,252 | 25,044,657 | 27,382,595 | | |
| Totals | 98,169,955 | 46,896,085 | 51,273,870 | | |

| YEAR | CCFs OF STEAM SUPPLIED | CTF ALLOCATION | CDF ALLOCATION | GSA PRICE PER CCF | CTF STEAM MARKET VALUE EQUIVALENT |
|---|---|---|---|---|---|
| 2006 | 163,062 | 77,895 | 85,167 | $ 34.95 | $ 2,722,436.64 |
| 2005 | 294,365 | 140,619 | 153,746 | $ 25.95 | $ 3,649,065.53 |
| 2004 | 524,273 | 250,447 | 273,826 | $ 21.95 | $ 5,497,302.24 |
| Totals | 981,700 | 468,961 | 512,739 | | $ 11,868,804.41 |

Conversion factor: 1 pound of steam = .01 ccf

| Facility | Square Footage | Percent |
|---|---|---|
| CTF | 410,934 | 47.77% |
| CDF | 449,295 | 52.23% |
| Total | 860,229 | 100% |

Corrections Corp of America



ABOUT CCA | WHY CCA | NEWS ROOM | INVESTOR | CAREERS

## ABOUT CCA

**MANAGEMENT TEAM**

**CCA HISTORY**

FACILITY LOCATIONS LIST
locations map

THE CORRECTIONS INDUSTRY
research findings
industry links
myths

WHAT'S NEW

CONTACT US

HOME

Executive Management | CCA Officers | Board of Directors

**John D. Ferguson**
President and Chief Executive Officer

 

John Ferguson has served as President and CEO of Corrections Corporation of America since August 2000. He joined the company following a 33-year business career that includes extensive experience in finance, entrepreneurial ventures, corporate turnarounds and government experience. Most recently he served as the Commissioner of Finance and Administration for the state of Tennessee for four years. Just four years after graduating from Mississippi State University with a bachelor's degree in accounting, he co-founded Econocom in 1971, a computer sales and leasing company, which he operated for 10 years. In 1973, Mr. Ferguson helped found a bank, assisted in the organization of the board of directors and served as a director of the bank. In 1982, he founded a merger and acquisitions firm and serve as CEO until 1993. He continued to serve on the board of the bank, serving as Chairman and CEO from 1990 until 1995.

**Ken Bouldin**
Executive Vice President & Chief Development Officer



Bouldin joined CCA as Chief Development Officer and an Executive Vice President on February 1, 2003. He most recently served as President of KAB Associates, Inc., a management consulting company, representing companies that manufacture security products for government and industry and representing manufacturers of technology products. With a 30-year business career, Bouldin has founded and led several companies and has led an active military career, having retired in 1994 as a Major General in the U.S. Army Reserve.

In 1995, Bouldin co-founded Econtech, an information technology staffing firm based in Nashville, which he sold in 2000. Prior to

establishing Econtech, he was Vice President of
Comdisco, Inc., a New York Stock Exchange
listed company, where he was responsible for
federal government contracting. From 1988-
1992, Bouldin served as President and Chief
Operating Officer of the Computer Dealers and
Lessors Association, headquartered in
Washington, D.C., an international trade
association of 350 companies. In his early
career, Bouldin founded a successful computer
sales and leasing company, Econocom, which
he led as Chairman, President and CEO for 17
years.

### Irving E. Lingo, Jr.
Executive Vice President & Chief Financial
Officer



Irving E. Lingo, Jr. has served as CCA's Chief
Financial Officer since December 2000. Most
recently, Lingo was Chief Financial Officer for
Bradley Real Estate, Inc., a NYSE listed real
estate investment trust headquartered in
Chicago, Ill. which merged in October 2000
with Heritage Realty, headquartered in Boston,
Mass. During Lingo's tenure at Bradley, the
company's assets grew from $180 million to
approximately $1 billion. Prior to joining
Bradley Real Estate, Lingo held positions as
Chief Executive Officer, Chief Operating Officer
and Vice President, Finance for several public
and private companies, including Lingerfelt
Industrial Properties, CSX Corporation, and
Goodman Segar Hogan, Inc. In addition, Lingo
has also served as an Audit Manager at Ernst
& Young LLP. Mr. Lingo received a Bachelor of
Science, Business Administration degree from
Old Dominion University Norfolk, Virginia.

### G.A. Puryear IV
Executive Vice President & General Counsel



G.A. Puryear was named General Counsel of
CCA in January 2001. Most recently, Puryear
served as Legislative Director and Counsel for
U.S. Senator Bill Frist, where he worked on
legislation and other policy matters. During the
fall of 2000, Puryear also served as a debate
advisor to Vice President Richard B. Cheney.
Puryear also worked as Counsel to the U.S.
Senate Committee on Governmental Affairs'
special investigation of campaign finance
abuses during the 1996 elections, which was
chaired by Senator Fred Thompson. Prior to his
career on Capital Hill, Puryear worked for
Farris, Warfield & Kanaday (now Stites and
Harbison), a law firm in Nashville. Puryear was
also a law clerk for the Honorable Rhesa
Hawkins Barksdale, U.S. Circuit Judge for the
Fifth Circuit in Jackson, Miss. Puryear earned a
bachelor's with highest honors in political
science from Emory University in 1990 and a
J.D., with honors, from the University of North
Carolina School of Law in 1993.

### Richard P. Seiter
Executive Vice President & Chief Corrections Officer



Richard P. Seiter joined CCA as Executive Vice President and Chief Corrections Officer in January 2005. Mr. Seiter was Director of the Ohio Department of Rehabilitation and Correction from 1983 to 1988. In that cabinet-level position, he oversaw the operations of 18 prison facilities, a staff of 8,000, and an annual budget of approximately $400 million. Most recently, Seiter served as an Associate Professor in the Department of Sociology and Criminal Justice at Saint Louis University, St. Louis, Missouri. He has authored two textbooks on corrections, Corrections: An Introduction (2005) and Correctional Administration: Integrating Theory and Practice (2002).

Seiter has served in a variety of roles with the Federal Bureau of Prisons including the Assistant Director for Industries, Education and Training (1989-1993), during which time he served as Chief Operating Officer of Federal Prisons Industries, a government corporation that sells goods manufactured by inmates. He also served as Warden, Federal Correctional Institution, Greenville, Illinois (1993-1999) and Warden, Federal Prison Camp, Allenwood, Pennsylvania (1981-1982). Seiter holds a B.S. in Business Administration from Ohio State University and earned his M.P.A. and Ph.D. in Public Administration from Ohio State.

### William K. Rusak
Executive Vice President and Chief Human Resources Officer



Bill Rusak was named CCA's Executive Vice President and Chief Human Resources Officer in July 2006. With nearly 30 years of experience in human resources, labor issues, employee relations, and corporate strategy and restructurings, Rusak has served as a consultant to CCA's Human Resources department for the past three months. Having held numerous board positions internationally over the past 20 years, Rusak has served in a variety of business and human resources roles in his career, including the president of two companies. For the past five years in Nashville, he has held the position of Vice President, Human Resources for the American headquarters of the global company BBA Fiberweb, based out of London, which is one of the world's largest organizations in the nonwovens business. From 1998-2000, he was President of Country Business Services in New York, which provides brokerage, financial and consulting services to buyers and sellers of small and medium-sized businesses. In Montreal for nine years, he served as Senior Vice President and Chief Administrative Officer of a major Canadian textile manufacturer, Dominion Textile. Earlier in his career, Rusak

Corrections Corp of America

also worked for Racemark International in New York and Firestone Tire and Rubber Company in Akron. Rusak earned a bachelor of law degree from La Salle University, and earned specialized training in business studies from McGill University in Montreal, Canada and the executive management program at the Wharton School at the University of Pennsylvania.

Website by ICGLink          10 Burton Hills Blvd. • Nashville,TN 37215 • 800-624-2931

Vice President, State Customer Relations

Tony Grande joined CCA in 2003 in the newly-created role of Vice President of State Customer Relations. In his capacity, Grande manages all existing state contracts, and he leads the company's national efforts to forge new partnerships with state Departments of Corrections. CCA currently serves about half of all states. Tony Grande previously served as Tennessee's Commissioner of Economic and Community Development (ECD). In that role, he led the recruitment and expansion of business to the State, managing an $85 million budget and 200 employees. Having worked in Tennessee government since 1998, Grande served as Assistant Commissioner and later as Deputy Commissioner of ECD. He previously led a publishing and database marketing company and served as a political speechwriter in Washington, DC. Tony Grande earned his Masters of Education at Vanderbilt University in Nashville, Tennessee and his Bachelor of Arts from The American University in Washington, D.C.

**Damon Hininger**
Vice President, Federal and Local Customer Relations



Damon Hininger assumed the role of Vice President of Federal and Local Customer Relations in March of 2006. Vice president of Federal Customer relations since June 2002, Hininger previously served CCA as Vice President, Business Analysis since December 2000. He has also served the company as Director, Strategic Planning and Director Proposal Development. Hininger joined the company in 1992 as a correctional officer at Leavenworth Detention Center in Leavenworth, Kansas, and was promoted to Training Manager at Central Arizona Detention Center in 1994. That same year, Hininger was also selected as both Central Arizona Detention Center's and CCA's company-wide Employee of the Year. He joined the corporate office in 1995, serving as Manager, Facility Start Up for three years. Hininger earned a B.S. from Kansas State University in 1991 and an M.B.A. from the Jack Massey Graduate School of Business at Belmont University in Nashville in 2000.

**Lucibeth Mayberry**
Vice President, Research, Contract, Proposals



Lucibeth Mayberry was named Vice President, Research, Contract, Proposals in March 2006. Mayberry previously served as Managing Director, State Customer Relations since 2004. She joined CCA in May 2003 as Senior Director, State Customer Relations. Before joining CCA, Mayberry served as a Senior Associate of the Taxation and Estate Planning Practice Group at the Nashville-based law

firm Stokes, Bartholomew, Evans and Petree.
She holds a bachelor's degree from the
University of Tennessee, a Juris Doctor from
Vanderbilt University and a Master of Laws in
Taxation from the University of Florida.

### J. Michael Quinlan
Senior Vice President



Mike Quinlan serves as senior vice president,
handling business opportunities for federal,
state and local government agencies. He is
based out of Washington, D.C. He previously
served as Chief Operating Officer and
Executive Vice President of CCA from June
1999 through June 2002. He joined the
company in 1993 as the head of the Strategic
Planning Division in Washington, D.C. Quinlan
joined CCA following a 25-year career in
public sector corrections, including serving as
the Director of the Federal Bureau of Prisons.
Quinlan holds a bachelor's degree from
Fairfield University, a doctor of jurisprudence
degree from Fordham Law School and a
master's degree from George Washington
University School of Law.

## Finance

### David Garfinkle
Vice President, Finance and Controller



David Garfinkle, CPA, joined CCA as Vice
President, Finance in February 2001. For the
five years prior, Garfinkle served as Vice
President and Controller for Bradley Real
Estate, Inc., a publicly traded, $1 billion real
estate investment trust located in Chicago,
Ill. Prior to joining Bradley Real Estate,
Garfinkle was a Senior Manager at KPMG Peat
Marwick LLP in Boston for seven years.
Garfinkle earned a Bachelor of Business
Administration, Summa Cum Laude, from St.
Bonaventure University in Olean, N.Y. in
1989.

### Senior Finance Staff

### Todd Mullenger
Vice President, Treasurer



Todd Mullenger assumed the role of Treasurer
of CCA in February 2001. Mullenger has
served the company as Vice President,
Finance since September 1998. Mullenger
joined the Company from Service
Merchandise where he served as Vice
President, Finance. He also spent several
years at Arthur Anderson LLP where his
experience included the private corrections
industry. Mr. Mullenger earned a bachelor's

degree in Finance from the University of Iowa in Iowa City and an M.B.A. from Middle Tennessee State University in Murfreesboro, Tenn.

## Health Services

### John Tighe
Vice President, Health Services



John Tighe joined CCA in January 2003 as Vice President, Health Services. John is responsible for the $100 million Health Services division within the CCA system. More than 700 CCA medical staff plus additional contracted medical personnel are under his supervision. CCA's Health Services provides comprehensive medical services for an inmate population in excess of 52,000 and includes medical health management, psychological services, dental and eye treatment, pharmaceutical management, along with emergency room and hospitalization management. Prior to joining CCA, John served since 1999 as the appointed Deputy to the Governor of Tennessee for Health Policy, with direct oversight of TennCare. Previously, he was the President and Chief Executive Officer of St. Thomas Health Services from 1994 until 1999, having earlier served as Executive Vice President and Chief Operating Officer of St. Thomas beginning in 1990. John has worked as a consultant with Herman Smith Associates, an international health care consulting firm and has held academic appointments at the University of Minnesota, Worcester State College and Rush University. He received his master's degree in hospital administration from Xavier University in Cincinnati; a bachelor's degree from Thomas More College in Kentucky; and a nursing certification from Good Samaritan Hospital in Cincinnati.

## Legal Affairs

### Steve Groom
Deputy General Counsel



Steve Groom joined CCA as Deputy General Counsel in early 2001. Groom joined the company after serving as a Partner in the Nashville law firm of Stites & Harbison. Previously, he served as General Counsel for SunTrust Bank in Nashville and Tampa Bay, and was also responsible for managing all litigation and outside counsel relationships for the SunTrust banks in Florida, Georgia, Alabama and Tennessee. From 1992 to 1993, he chaired the Corporate Counsel Committee of the Nashville Bar Association. Groom earned a bachelor's degree from Lipscomb University in 1973 and a J.D. from the University of Memphis in 1980.

'orrections Corp of America

### Natasha Metcalf
Associate General Counsel and Vice President, Contract Management



Natasha Metcalf serves as Associate General Council and Vice President, Contract Management. Metcalf joined CCA in January 2003 as Vice President of Local Government Customer Relations. Prior to joining CCA, Metcalf was appointed Commissioner of the Tennessee Department of Human Services in December 1998. As head of this agency with a $1.4 billion budget, Metcalf was responsible for more than 130 office locations and 4,000 employees statewide. She earned her law degree from the University of Tennessee College of Law and a bachelor's degree from Hampton University in Virginia. Prior to her commission appointment, Metcalf served from 1997 until 1998 as general counsel for the Tennessee Department of Finance and Administration. In 1996, she served as Deputy Legal Counsel to Tennessee Governor Don Sundquist. She began her career as an associate with the law firm of Kennerly, Montgomery and Finley in Knoxville.

## Operations

### Dennis Bradby
Vice President, Inmate Programs



Dennis Bradby has been Vice President, Inmate Programs since 1991. In 1987, he was appointed Vice President, Operational Support Systems for CCA. Prior to his move to the corporate office, Bradby served as Facility Administrator at CCA Silverdale Facilities in Chattanooga, Tennessee, from 1985-86. In 1984, he served as warden of the CCA Houston Processing Center in Houston, Texas. From 1969 to 1984, Bradby served with the Virginia Department of Corrections in a variety of management positions. Bradby graduated from Norfolk State University in Virginia in 1972. He also serves as an auditor for the American Correctional Association.

### Linda A. Staley
Vice President, Design and Construction Management



Linda A. Staley has been Vice President, Design and Construction Management since 1994. She joined the company in 1985 as Director, Project Development. Prior to joining CCA, Staley spent 18 years working for federal governmental agencies, including the Department of Justice and the Immigration and Naturalization Service in the contracting and procurement field. Staley attended Wayne State College, where she studied business administration.

**Jimmy Turner**
Vice President, Facility Operations, Business
Unit 2



Jimmy Turner has served as Vice President,
Operations of CCA since 1999. In March
2006, he was named Vice President, Facility
Operations for Business Unit 2, which is
comprised of Divisions III and IV. A 28-year
corrections professional, Turner served as
warden of CCA's Northeast Ohio Correctional
Center in Youngstown from March 1998 to his
promotion to vice president. A 18-year CCA
employee, Turner joined CCA in 1989 as
assistant warden of it's Silverdale Facilities in
Chattanooga, Tenn. He also served as
assistant warden at CCA's Winn Correctional
Center in Louisiana and CCA's Metro-
Davidson County Detention Facility in
Nashville, where he ultimately was promoted
to warden. Turner has also served as a CCA
senior divisional director.

**Steven Conry**
Vice President, Facility Operations, Business
Unit 3



Steven Conry joined CCA in March 2006 as
Vice President, Facility Operations for
Business Unit 3, which is comprised of
Divisions V and VI. Conry previously served
23 years with the New York City Department
of Correction, most recently acting as Chief of
Facility Operations for the agency for the last
four years. He joined the New York City
Department of Correction in 1983 as a
correctional officer and served in many
leadership roles prior to his current
appointment, including warden, assistant
divisional chief, chief of management and
planning, and chief of security for the agency.
Conry graduated magna cum laude with a
bachelor's degree in public management from
John Jay College of Criminal Justice, where he
later received a master's degree in public
administration.

<u>Senior Facility Operations Staff</u>

**Brian Collins**
Vice President, Facility Operations, Business
Unit I



Brian Collins joined CCA as Vice President of
Facility Operations, Business Unit I in June
2006.  Prior to CCA, Collins served a
distinguished  25-year career in the service
industry with Wal-Mart Stores, Inc., that
included roles in management, human
resources, customer satisfaction, staff
training, and professional development. Since
1981, he has held positions to include
Regional Personnel Manager, Director of
Operations, Market Director, Director of Field

Support, Director of Operations Support, and Director of Operations. He most recently served as Market Manager for Sam's Club in Dallas, Texas. In this role, he oversaw 11 Sam's Clubs and 1,800 employees, and was responsible for $822 million in annual revenues, as well as market planning, employee development, strategic planning for his market, and financial and cost control. Collins holds a bachelor of science degree in business administration from the University of Arkansas at Pine Bluff.

### Technology

**John Pfeiffer**
Vice President, Technology and Chief Information Officer



John Pfeiffer joined CCA in the newly-created position of Vice President, Technology and Chief Information Officer in August 2002. Pfeiffer brings to CCA eight years of experience in information technology and four years of experience in the U.S. Navy. Before joining CCA, he spent three years as Chief of Operations at Bytes of Knowledge, a Nashville-based IT consulting company. Prior to his work at Bytes of Knowledge, Pfeiffer served as Director of Information Systems and Telecommunications at LifeTrust America. From 1994 to 1998 Pfeiffer served as Administrator, Informatics Center at Vanderbilt University Medical Center, and from 1990 to 1994, he served in the U.S. Navy as a Surface Warfare Officer. Pfeiffer earned an M.B.A. from Belmont University in Nashville Tennessee in 1998 and a B.S. from Vanderbilt University in Nashville in 1990. He continues to serve as Adjunct Instructor of Information Systems Management at the Jack C. Massey School of Business at Belmont University.

<u>Sr. Technology Staff</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RICHARD MOONBLATT | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | )     Civil Action No.: 1:07-CV-01922 |
| | )     Judge J. D. Bates |
| DISTRICT OF COLUMBIA, *et al.* | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## <u>ORDER</u>

Upon the motion of Defendant District of Columbia and pursuant to Fed. R. Civ. 12(b)(6) and 56(c) as well as D.C. Code § 12-301(8)(2001 ed.), and any opposition thereto by the Plaintiff, it is this ___ day of _____, 2007

ORDERED that the Defendants' motion be, and it is hereby GRANTED;

FURTHER ORDERED that Judgment is entered against the Plaintiff and in favor of the District of Columbia;

FURTHER ORDERED that the Plaintiff's complaint is dismissed with/without prejudice.

_____
United States District Judge

SERVE:

Warren E. Gorman, Esquire
5530 Wisconsin Avenue
Suite 1209
Chevy Chase, MD 20815
Attorney for Plaintiff Moonblatt