**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RICHARD MOONBLATT,

                    Plaintiff,

        v.                                           Civil Action No.  07-01922 (JDB)

DISTRICT OF COLUMBIA,

et al.,

                    Defendants.

<u>**MEMORANDUM OPINION**</u>

Plaintiff Richard Moonblatt -- a Caucasian, Jewish, homosexual male -- was incarcerated on three separate occasions at the Correctional Treatment Facility located in the District of Columbia. He brings this case against defendants for the alleged violation of his civil rights on account of his race, religion, and sexual orientation. Defendants are the District of Columbia; the Corrections Corporation of America ("CCA"); Steve Smith, a warden employed by the District; Fred Figueroa and John Caulfield, wardens of the Correctional Treatment Facility and employees of CCA; and John Does 1 through 8, alleged employees of the District of Columbia at the Correctional Treatment Facility. Moonblatt seeks damages pursuant to 42 U.S.C. § 1983 (Count I) and 42 U.S.C. § 1981 (Count II) for violation of his constitutional rights. He further requests relief for injuries sustained due to the District's negligent failure to supervise, hire, and train correctional officers (Counts III and IV), as well as the District's negligence in caring for him and intentional infliction of emotional distress (Count V). Finally, Moonblatt seeks damages for

1

defendants' violation of the D.C. Human Rights Act ("DCHRA") (Count VI). On each count, Moonblatt seeks compensatory damages in the amount of five million dollars, punitive damages in the amount of five million dollars, plus interest, costs, and attorney's fees.

The District of Columbia has moved to dismiss this action pursuant to Fed. R. Civ. P. 12 (b)(6), or in the alternative for summary judgment in its favor pursuant to Fed. R. Civ. P 56(c). The District moves on the following grounds: (1) Moonblatt has failed to establish the requisite state custom or practice that caused the alleged constitutional violation under 42 U.S.C. § 1983; (2) Moonblatt has failed to allege that the District infringed upon his ability to make and enforce contracts or engaged in a policy or custom that caused him harm as required under 42 U.S.C. § 1981; (3) Moonblatt has failed to allege that he was harmed by persons employed by the District; and (4) Moonblatt has failed to make a timely claim under the DCHRA. The District further contends that because some of Moonblatt's allegations rest upon principles of *respondeat superior,* which according to the District is inapplicable to municipalities under either § 1983 or § 1981, those claims must be dismissed.  CCA, a private company that manages and operates the Correctional Treatment Facility, and Fred Figueroa, an employee of CCA and a warden of the Correctional Treatment Facility, join the District's motion on Counts I, II, and VI.[1] Upon careful consideration, and for the reasons set forth below, the Court will deny defendants' motions to dismiss.[2]

---

[1] The complaint refers to Fred Figera, but CCA's papers joining the District's motion clarify that the proper defendant is Fred Figueroa.

[2] Neither Steven Smith nor John Caulfield, named as defendants in the complaint, appear to have been served, and no motion has been filed on their behalf.

## BACKGROUND

Moonblatt was incarcerated in District of Columbia correctional facilities operated by CCA during the following approximate periods: (1) January 6, 2004 through October 29, 2004; (2) November 22, 2005 through February 28, 2005; and (3) February 16, 2006 through December 30, 2006. Compl. ¶¶ 8, 11. He filed this complaint on October 25, 2007. During his first period of incarceration, Moonblatt alleges that: (1) he was consistently refused medical treatment for his brain tumor and ignored by medical staff, see Compl. ¶¶ 12, 25, 29; (2) he was at various times denied mandatory recreation time, kosher or vegetarian meals, sick call, adequate clothing, and running water, see Compl. ¶¶ 13, 15 18, 44; (3) he was not removed from his cell after being sexually harassed, see Compl. ¶ 16; (4) he was threatened, attacked, beaten, spit upon, assaulted, and stabbed by other inmates in the presence of correctional officers who did not attempt to aid him, see Compl. ¶¶ 36, 38, 39, 41-43, 52-53; (5) he was physically and verbally assaulted by Sergeant McIntyer, Corporal Gordon, Corporal Knight (who referred to him as a "filthy Jew"), Lieutenant Holmes (who referred to him as a "fag"), Officer Murray (who called him a "filthy Jew," punched him, and spit in his face), Corporal Thomas (who directed racist and homophobic remarks towards him), Officer William (who directed homophobic and racist remarks towards him and physically threatened him), Officer Davis (who directed racist and homophobic remarks towards him and physically threatened him), Officer Little (who made explicit sexual remarks and threatened him), Officer Marion, Officer Cooper (who assaulted him and called him "Jew boy," "fag," and "whitey"), Officer Jordon, Officer Jackson, Officer Cob, and Officer Drummond (who directed homophobic and religious slurs towards him), see Compl.

¶¶ 14, 17, 19, 21, 23-24, 31, 33, 46-51; and (6) he was sodomized by Officer Robert, <u>see</u> Compl. ¶ 35.

During Moonblatt's second period of detention, he alleges that he was assaulted by other inmates in the presence of correctional officers who did not intervene on his behalf, <u>see</u> Compl. ¶¶ 52-53. Finally, during his third period of incarceration, Moonblatt alleges that: (1) he was denied medical treatment for his brain tumor and then given incorrect medication on subsequent occasions, <u>see</u> Compl. ¶¶ 56, 61-62; (2) he was verbally harassed by correctional officers, who referred to him as a "fagot" [sic] and consistently directed other racial and religious slurs towards him, <u>see</u> Compl. ¶¶ 54, 58, 65; (3) he was physically assaulted on multiple occasions, including one incident during which a correctional officer slammed his head against a concrete wall, <u>see</u> Compl. ¶¶ 57, 59, 60, 66; and (4) he was physically and verbally assaulted in the presence of correctional officers who did not intervene and refused to transfer him to another cell pursuant to his requests, <u>see</u> Compl. ¶¶ 55, 64. Moonblatt also alleges that he repeatedly gave written notice to the District pursuant to D.C. Code § 12-309 that he would seek relief for his mistreatment, thereby providing adequate notice of his claims. <u>See</u> Compl. ¶ 71.

<u>**STANDARD OF REVIEW**</u>

1. <u>Motion to Dismiss</u>

The Federal Rules of Civil Procedure require only that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)); <u>accord</u> <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (2007) (per curiam).  Although

"detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Bell Atl. Corp., 127 S. Ct. at 1964-65; see also Papasan v. Allain, 478 U.S. 265, 286 (1986). Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp., 127 S. Ct. at 1965 (citations omitted). However, a court "must not make any judgment about the probability of the plaintiff's success, for a complaint 'may proceed even if it appears that a recovery is very remote and unlikely'" or that the plaintiff "will fail to find evidentiary support for his allegations." Aktieselskabet AF 21. November 21 v. Fame Jeans, Inc., 525 F.3d 8, 17 (D.C. Cir. 2008).

The notice pleading rules are not meant to impose a great burden on a plaintiff. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002). When the sufficiency of a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor. Leatherman v. Tarrant County Narcotics & Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979); see also Erickson, 127 S. Ct. at 2200 (citing Bell Atl. Corp., 127 S. Ct. at 1965)). The plaintiff must be given every favorable inference that may be drawn from the allegations of fact. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint."

5

Kowal v. MCI Commc'n Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nor does the court accept "legal conclusions cast in the form of factual allegations."  Aktieselskabet AF 21. November 21, 525 F.3d at 17; see also Domen v. Nat'l Rehab. Hosp., 925 F. Supp. 830, 837 (D.D.C. 1996) (citing Papasan, 478 U.S. at 286)

## 2. Summary Judgment

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" which it believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true, accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50

6

(citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## DISCUSSION

I.     *Count I: 42 U.S.C. § 1983 Claims Against the District, CCA, and Fred Figueroa*

In Count I, Moonblatt brings a claim under 42 U.S.C. § 1983 alleging that defendants, individually and through their agents, discriminated against him due to his race, religion, and sexual orientation, and that their actions deprived him of his constitutional rights, privileges, and immunities. See Compl. ¶¶ 9-11. In response, the District claims that municipalities cannot be liable under § 1983 unless their customs or practices have caused the injury. Here, the District contends that Moonblatt has failed to make this required allegation and that his claims rely upon *respondeat superior*, which is inapplicable to municipalities under § 1983. See Def's Mot. 7. Consequently, the District asserts that it is not liable for the supposedly unlawful actions of its employees or agents. Id. Moonblatt contends, however, that the District was deliberately indifferent to the conduct of its agents and employees that led to his injuries. Relying upon Warren v. Dist. of Columbia, 353 F.3d 36 (D.C. Cir. 2004), he argues that a municipality's actual or constructive knowledge of ongoing constitutional violations can establish the predicate for § 1983 liability. See Pl.'s Opp'n at 3. Under this view, Moonblatt does not rely upon *respondeat superior*, but alleges instead that the District directly caused his harm through its willful blindness to the abuses that he was enduring.

a.   § 1983 Claim Against the District

The Supreme Court has made clear that municipalities do not enjoy absolute immunity from § 1983 liability. Monell v. Dep't of Soc. Serv. of New York, 436 U.S. 658, 690-91 (1978).

7

Instead, they may be held liable for unconstitutional actions undertaken pursuant to issued policy statements, ordinances, regulations, or other sources of official municipal policy. Id. The Court has stated that "[m]unicipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered." Pembaur v. Cincinnati, 475 U.S. 469, 481 (1986); see also Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989). This "final authority" requirement creates a high threshold to establish municipal liability. In a case factually similar to this one, the D.C. Circuit found that the only individuals who could be considered to have final policy-making authority over the Occoquan prison (a District of Columbia prison) are the Mayor, the Director of the District of Columbia Department of Corrections, or members of the D.C. city council. See Triplett v. Dist. of Columbia, 108 F.3d 1450, 1453 (D.C. Cir. 1997). Moonblatt has not alleged those individuals were involved in any capacity here.  Nor has he offered any facts from which that allegation could be inferred. Even at this early stage, any assumption that the defendants here have requisite final authority over municipal policy would amount to impermissible speculation. See Bell Atl. Corp., 127 S.Ct. 1955.

However, a "§ 1983 plaintiff . . . may be able to recover from a municipality without adducing evidence of an affirmative decision by policy makers if able to prove that the challenged action was pursuant to a state 'custom or usage.'" Pembaur, 475 U.S. at 484 n. 10. Some actions are so "permanent and well settled" that they may be considered governmental customs or practices even if they have not received formal approval through official state decision-making channels. Monell, 436 U.S. at 691. Thus, the custom and policy prerequisite to § 1983 liability merely requires that the municipal action that causes the alleged constitutional

violation be taken under the color of official policy. Id. at 692.  Hence, Moonblatt can prevail on a § 1983 claim if he can prove that the District had a policy or custom that directly caused the violation of his rights.

Seeking to prove that the District had such an unconstitutional policy or custom in this instance, Moonblatt points to authority that equates willful blindness towards repeated conduct with the adoption of an unlawful municipal policy. See City of St. Louis v. Prapotnik, 485 U.S. 112, 130 (1988); see also Canton, 489 U.S. at 388 ("Only where a municipality's conduct evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."); Farmer v. Brennan, 511 U.S. 825, 841 (1994); Warren, 353 F.3d at 39; Baker v. Dist. of Columbia, 326 F.3d 1302, 1306-07 (D.C. Cir. 2003); Daskalea v. Dist. of Columbia, 227 F.3d 433, 441 (D.C. Cir. 2000). Deliberate indifference arises where the "municipality, due to actual or constructive knowledge that its agents will probably violate constitutional rights, adopts a policy of inaction." Warren, 353 F.3d at 39; see also Baker, 326 F.3d at 1306-07 ("Deliberate indifference is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, an objective standard.").

Here, Moonblatt claims that the District knew or should have known about the persistent violations of his rights but declined to act in response. See Pl.'s Opp'n at 3. At this stage, of course, Moonblatt's factual allegations must be accepted as true for purposes of this motion to dismiss. The District argues, however, that his allegations are bald and conclusory and thus should be rejected by the Court. See Def.'s Mot. at 4, 7. Naturally, the Court need not accept legal conclusions that merely masquerade as factual assertions. But the pleading requirement at

the motion to dismiss phase is not steep; a court merely requires assertions that are "more than labels and conclusions." Bell Atl. Corp., 127 S.Ct. at 1965 (citing Papasan, 478 U.S. at 286). Thus, if a complaint contains both legal and factual statements, a court may find that the complaint rises above "a speculative level." Id.

Moonblatt makes seventy-three allegations under Count I, most of which contain purely factual assertions. He also contends that the District had constructive, if not actual, knowledge of his mistreatment because he repeatedly gave written notice to the District, as required by D.C. Code § 12-309, that he would seek relief for the abuse that he suffered at the hands of the correctional officers. Compl. ¶ 71. Moonblatt does not indicate in his complaint whether he gave this notice before, during, or after his last period of incarceration. He does, however, state in his opposition brief that his "initial disclosures set forth hundreds of pages of documentation of his complaints and grievances" that were ignored by defendants for a period of over two years. See Pl.'s Opp'n at 3. Moonblatt's most recent period of incarceration ended in December 2006 and he filed this complaint in October 2007. Compl. ¶ 11. Accepting Moonblatt's allegations as true, then, the Court can infer that Moonblatt gave at least some notice to the District while he was still in custody. He also suggests that the District had constructive knowledge of his mistreatment because the jail where he was held was operated, supervised, and managed directly by District employees. Compl. ¶¶ 4, 7.  Constructive knowledge is neither a purely factual nor purely legal question, but rather a mixed question of law and fact. Blackmore v. Coleman, 701 F.2d 967, 970 (D.C. Cir. 1983); see Pl.'s Opp'n at 3. As the Court has an obligation to treat such mixed questions as factual assertions, they must also be accepted as true under Rule 12(b)(6). See Alston v. Dist. of Columbia, 2008 WL 2461034, at *3 (D.D.C. June 19, 2008) ("In resolving a

Rule 12(b)(6) motion, the court must treat the complaint's factual allegations -- including mixed questions of law and fact -- as true and draw all reasonable inferences therefrom in the plaintiff's favor."); see also Fed R. Civ. P. Form 9. Moonblatt has therefore satisfied his pleading burden for purposes of this motion to dismiss.[3]

### b. § 1983 Claim Against CCA

It is well established that claims against private actors may only proceed under § 1983 if (1) the plaintiff was deprived of a federal right by (2) an individual acting under color of state law. Gomez v. Toledo, 446 U.S. 635, 640 (1980); see also Rendell-Baker v. Kohn, 457 U.S. 830, 836 (1982). In United States v. Prince, 383 U.S. 787, 794 n.7 (1966), the Supreme Court concluded that "in cases under § 1983, 'under color of law' has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." See also United States v. Classic, 313 U.S. 299, 326 (1941). Thus, the primary inquiry is whether the private entity's actions can be fairly viewed as state action. Gomez, 457 U.S. at 638. If the actions are not justly attributable to the state, then the claim must be dismissed.

Here, the pertinent inquiry is whether the District has exercised its coercive power, or has otherwise significantly encouraged the challenged activities, in such a manner that the decisions of the private defendants can be viewed as those of the District itself. See Blum v. Yaretsky, 457 U.S. 991, 1004 (1982). Courts have looked to a number of factors to determine the level of a state's involvement with private affairs, including: (1) the amount of government funding given to the private entity; (2) the extent of the regulation of the private entity by the state; and (3) whether the private party is engaging in a public function that is traditionally within the

---

[3] Although the Court has some doubt whether Moonblatt can ultimately succeed in establishing the basis for his custom and usage claim against the District under § 1983, such doubts as to the allegations in the complaint do not warrant dismissal at this early stage.  See Bell Atl. Corp, 127 S. Ct. at 1965.

exclusive province of the state. See Blum, 457 U.S. at 1004-05; Jackson, 419 U.S. at 351; Rendell-Baker, 457 U.S. at 840-42.  The analysis requires examining the totality of the circumstances; as the Court in Jackson put it, "[t]he true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required." 419 U.S. at 351.

Moonblatt has satisfied the first requirement for bringing a § 1983 claim by alleging that CCA and its employees, through their discriminatory actions, have deprived him of his rights, privileges, and immunities secured under the Constitution. See Complaint ¶¶ 9-11.  The crux of this dispute centers around whether those actions were taken under color of state law. The Court has very little to go on regarding this question because CCA has failed entirely to address this point and the District's briefing is understandably silent on this issue. Nevertheless, the decisions in Rendell-Baker and Blum addressed this same question and provide some guidance. In Rendell-Baker, a privately owned school founded to help students with drug, alcohol, and other behavioral problems was operated by a private board of directors but largely funded by the state. In exchange for such funding, the school was required to abide by certain regulations established by the state, such as fixed student-to-teacher ratios, certain record keeping procedures, and other identified personnel policies. Rendell-Baker, 457 U.S. at 832, 840-43. Notwithstanding this extensive funding and regulation, the conduct of the school and its employees was not considered to be state action. Id. A similar result was reached in Blum. There, the Supreme Court considered whether the actions of doctors and nurses within privately owned and operated nursing homes constituted state action. The Supreme Court found that they did not because extensive regulation and funding by the state, taken alone, was not sufficient to show that the private decisions should be attributed to state actors. Id. Furthermore, the Supreme Court

12

concluded that because the nursing home had not exercised powers traditionally within the exclusive prerogative of the state, a significant nexus between the state and the private entity did not exist. Blum, 457 U.S. at 1005.

Notwithstanding some surface similarities, the situation here is distinguishable from those in Rendell-Baker and Blum. The District and CCA have a sufficiently close nexus to conclude, for purposes of this motion, that CCA's actions were taken under color of state law. To begin with, CCA presumably receives significant funds from the District incident to CCA's operation of the Correctional Treatment Facility.  The paucity of the current record on this point, however, renders the Court unable to determine the nature and extent of any funding received by CCA from the District.  This discrepancy has only been exacerbated by CCA's decision simply to join the District's motion to dismiss rather than file its own papers that contain arguments relating specifically to CCA.  Thus, the Court must turn to other factors in this analysis.

There does not appear to be any direct evidence that the District heavily regulates CCA's daily operations. The contract between the two parties states that the District does not retain any authority for the hiring, firing, or management of  CCA's employees. See Def.'s Mot. Ex. A. Furthermore, the contract also states that CCA is fully responsible for assigning its officers, scheduling shifts, training, and equipping its employees. Id. As a formal matter under the terms of the contract, then, the Correctional Treatment Facility seems less regulated than either the school in Rendell-Baker or the nursing home in Blum. On the other hand, in its answer, CCA claims that its employees "act[] under close official supervision of the District of Columbia." CCA Answer ¶ 116.  Although it is hard to imagine that no correctional or other policies of the District apply to CCA, there is no additional record evidence regarding how the facility is

operated in practice.  Thus, it is difficult to draw any definitive conclusions regarding the extent

of regulation (or lack thereof) involved in the relationship between the District and CCA on the

basis of this sparse record.

Lastly, the Court must consider whether CCA's activities are the type traditionally left to

the exclusive prerogative of the state. Rendell-Baker, 457 U.S. at 842; see also Jackson, 419 U.S.

at 353. Although prisons have historically been run by states and municipalities, a trend towards

privatization has emerged in recent years. Just as with the school in Rendell-Baker and the

nursing home in Blum, it may be possible for a prison to be privately operated to such an extent

that it is no longer under the exclusive control of the state. See Rendell-Baker, 457 at 842; Blum,

457 U.S. at 1012. One critical difference here, however, is that only the state can take steps to

incarcerate individuals or release them. In that sense, the state retains authority -- and significant

responsibility -- that cannot be transferred to private entities.  Contrary to private schools and

hospitals, there is no similarly extensive history of private ownership with respect to prisons.

Simply put, prisons have been uniquely governmental institutions.  The Court concludes,

therefore, that CCA's role in operating the Correctional Treatment Facility is one that is

traditionally associated with the exclusive prerogative of the state.

Taken as a whole, the foregoing factors offer a somewhat ambiguous answer to the state

action inquiry.  The first two factors are inconclusive on this record, but the third strongly favors

Moonblatt's argument that CCA's actions were performed under color of state law. As this

complaint was filed *pro se*, and CCA has failed to offer any independent evidence to the

contrary, the Court finds for present purposes that CCA's actions were performed under color of

state law.  As a result, the Court will not dismiss the § 1983 claim against CCA at this time.

14

c. § 1983 Claim Against Fred Figueroa

The § 1983 claim against Figueroa largely tracks the § 1983 claim against CCA, his

employer. Hence, the same state action analysis is determinative if Figueroa is sued only in his

"official" capacity. "When sued in their official capacities, government officials are not

personally liable for damages." Atchinson v. Dist. of Columbia, 73 F. 3d 418, 424 (D.C. Cir.

1986); see also Kentucky v. Graham, 473 U.S. 159, 166 (1985). A § 1983 suit for damages

against municipal officials in their official capacities is thus equivalent to a suit against the

municipality itself. Barnhardt v. Dist. of Columbia, 2008 WL 2331915, at *4 (D.D.C. June 09,

2008); see also Atchinson, 73 F.3d at 424; Graham, 473 U.S. at 165-66. Moonblatt's complaint,

with respect to Figueroa, alleges that "[a]t all times hereinafter mentioned he was acting in his

capacity as an employee of the Correctional Treatment Facility that is owned by the Corrections

Corporation of America." Compl. ¶ 5. It seems, then, that the § 1983 claims against Figueroa

are brought against him in his "official," rather than his personal, capacity. "As long as the

government entity receives notice and an opportunity to respond, an official-capacity suit is, in

all respects other than name, to be treated as a suit against the entity   . . . [i]t is *not* a suit against

the official personally, for the real party in interest is the entity." Graham, 473 U.S. at 165

(citation omitted). By analogy here, Moonblatt's § 1983 claim against Figueroa is redundant of

his claim against CCA. There is no suggestion in the complaint that Moonblatt has any claims

against Figueroa in his personal capacity. Notwithstanding this redundancy, however, the

Supreme Court has authorized official capacity suits against local government officials. See

Monell, 436 U.S. at 691 n. 55; see also Winder v. Erste, 2005 WL 736639 at *5 (D.D.C. March

31, 2005). By analogy, once again, case law suggests that Moonblatt's claim against Figueroa

may proceed even though it is essentially entirely duplicative of his claim against CCA on this point. Accordingly, the Court will deny this motion as well.

II.      *Count II: 42 U.S.C. § 1981 Claims Against the District, CCA, and Fred Figueroa*

In Count II, Moonblatt brings a claim under 42 U.S.C. § 1981 alleging that defendants discriminated against him due to his race, religion, and sexual orientation, thereby depriving him of his constitutionally protected civil rights. See Compl. ¶¶ 75-76. In response, the District relies on Domino's Pizza Inc. v. McDonald, 546 U.S. 470 (2006), for the proposition that Moonblatt has failed to allege (and cannot prove) that defendants' conduct violated his right to make and enforce contracts, a prerequisite to recovery under § 1981. Def.'s Mot. at 8. The District also alleges that this claim should be dismissed because Moonblatt has failed to allege that a District custom or policy violated his rights. Id. Moonblatt responds that it is appropriate to use the same analysis regarding custom or policy under § 1981 as under § 1983, and that the District's deliberate blindness to the actions of its employees and agents led to the adoption of an unlawful custom and policy here. Pl.'s Opp'n at 3.

a. § 1981 Claim Against the District

The District contends that Moonblatt's § 1981 claim is improper because he failed to allege that the District has violated his right to make and enforce contracts. Def.'s Mot. at 8. But this Court recently held that Domino's does not necessarily foreclose civil actions under § 1981 for claims lacking contractual privity. See Mazloum v. Dist. of Columbia, 522 F. Supp. 2d 24, 38 (D.D.C. 2007). Rather, the narrow holding in Domino's merely requires that where a contract is the basis of the § 1981 claim, a plaintiff must have rights to assert under that contract. Id. at 37. But where the basis of the claim falls instead under the "full and equal benefit" clause of § 1981,

16

a contractual relationship is not a prerequisite to a viable claim. Id. This Court came to that

conclusion in part because the plaintiff in Domino's explicitly framed his claim in terms of the

"make and enforce contracts" clause of the statute.  546 U.S. at 475 (establishing that plaintiff

argued that he had a cause of action because he made and enforced contracts for the corporation).

Thus, the Supreme Court did not have occasion to discuss any other component of § 1981, and in

particular the opinion made no reference to the "full and equal benefit" clause. Other circuits

have "maintained . . . allegations of overt acts of discrimination" that do not involve contractual

relationships under § 1981 by way of the "full and equal benefit" clause. See Mazloum, 522 F.

Supp. 2d at 38 (full discussion of circuit history regarding this issue). Additionally, authority in

the D.C. Circuit suggests that § 1981 claims may proceed under the equal benefit clause in the

absence of a contractual relationship.  See Banks v. Chesapeake & Potomac Tel. Co., 802 F.2d

1416, 1421 (D.C. Cir. 1986) ("Both § 1983 and § 1981 provide remedies for a broad range of

actions that could be characterized as various state torts . . . [and] § 1981, like § 1983, broadly

protects the right of all persons 'to the full and equal benefit of all laws and proceedings for the

security of persons and property.'") (emphasis added); see also Crawford-El v. Britton, 93 F.3d

813, 837 n.12 (D.C. Cir. 1996) (Silberman, J., concurring) ("In addition to § 1983, plaintiffs can

sue officials for monetary relief under 42 U.S.C. § 1981 (1994) (civil action for denying persons

the 'full and equal benefit of all laws and proceedings' guaranteeing security of persons and

property"), vacated on other grounds, 523 U.S. 574 (1998).

Given this context and the fact that the Supreme Court did not make a single reference to

the "full and equal benefit" clause in the Domino's opinion, this Court has held that where a

claim is based upon the full and equal benefit clause under § 1981, a plaintiff need not rely upon

contractual privity to bring a viable claim. Mazloum, 522 F. Supp. 2d at 37.  In the present case,

Moonblatt's allegations are plainly based on the full and equal benefit clause, and thus do not

require a contract to proceed, contrary to the District's contentions. See Compl. ¶ 76 ("The

defendants jointly and severally through their agents and employees failed to give the plaintiff

equal rights under the law based upon his race, religion, and sexual orientation. He was denied

his civil rights.").

The District also asserts that Moonblatt's claim is legally inadequate because he has not

alleged that his injuries were sustained pursuant to a policy or custom of the District. Def.'s Mot.

at 9. Putting aside whether a § 1981 damages claim against a municipality is proper in any

event,[4] the District insists that Moonblatt must show that the District acted pursuant to a custom

or policy as a prerequisite for recovery. Id.  As discussed above, however, Moonblatt has alleged

beyond a speculative or conclusory level that his injuries were incurred as a result of a municipal

custom or policy, and he need not at this time demonstrate that his injuries were caused by direct

state action. See Pembaur, 475 U.S. at 484; Monell, 436 U.S. at 694. Hence, the analysis under §

1981[5] simply mirrors that under § 1983, and for the same reasons identified with respect to §

---

[4] There is evidently a division of authority concerning the scope of Jett, which held that § 1983 provides the "exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." 491 U.S. at 735. Compare Fed'n of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1214 (9th Cir. 1996) (holding that § 1981, as amended in 1991, "contains an implied cause of action against state actors, thereby overturning Jett's holding that 42 U.S.C. § 1983 provides the exclusive federal remedy against state actors for the violation of rights under 42 U.S.C. § 1981"), with Oden v. Oktibbeha County, 246 F.3d 458, 462-64 (5th Cir. 2001) (concluding that Jett was not overruled by the 1991 amendments). The District does not address this point in its motion. Thus, the Court need not take a position on this question.

[5] By its language, § 1981 primarily protects against racial discrimination -- entitling persons "to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981 (emphasis added). Although Moonblatt is Caucasian, the Supreme Court has suggested that § 1981 was meant to prohibit discrimination against both minorities and non-minorities alike. See Saint Francis College v. Al-Khazraji, 481 U.S. 604, 609 (1987) ("Although § 1981 does not itself use the word 'race,' the court has construed the section to forbid all "racial" discrimination in the making of private as well as public contracts."); L.N. McDonald v. Santa Fe Trail Trans. Co., 427 U.S. 273, 280 (1976) ("[T]he Act [§ 1981] was meant, by its broad

1983 the Court finds that Moonblatt's claim that his injuries were incurred pursuant to state custom or policy is viable at this point in these proceedings.

### b. § 1981 Claim Against CCA & Figueroa

CCA merely joins the District's motion with respect to § 1981. For the same reasons that the Court declines to dismiss that claim against the District -- and for the same reasons (regarding state action) that the Court will not dismiss Moonblatt's § 1983 claim against CCA -- the Court will deny CCA's motion to dismiss on this point as well. Similarly, as with his § 1983 claim, Moonblatt's allegations against Figueroa under § 1981 are duplicative of those brought against CCA, but may nonetheless proceed. Employing the same analysis discussed above, then, the Court will deny the motion to dismiss that claim as well.

III.   *Counts III, IV, and V: Negligent Supervision, Negligent Hiring and Training, and Intentional Infliction of Emotional Distress Claims Against the District*

Moonblatt alleges that the District, through its agents and employees: (1) negligently failed to supervise and to care for him while he was in its custody; (2) negligently failed properly to supervise, train, hire, and monitor the actions of the correctional officers in the Correctional Treatment Facility; and (3) intentionally inflicted emotional distress upon him. See Compl. at ¶¶ 79-94. The District responds to these allegations by stating that Moonblatt has failed to identify the offending officers as employees of the District. Moreover, if the offending individuals are

---

terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race."); see also Arendale v. City of Memphis, 519 F.3d 587, 594 n.5 (6th Cir. 2008); Des Vergnes v. Seekonk Water Dist., 601 F.2d 9, 14 (1st Cir. 1979) ("a [white] person has an implied right of action [under § 1981] against any other person who, with a racially discriminatory intent, injures him because he made contracts with non-whites"). Indeed, the D.C. Circuit has held that a plaintiff can sue for discrimination incurred due to the plaintiff's Jewish faith under § 1981. Gersman v. Group Health Ass'n, Inc., 931 F.2d 1565, 1569 (D.C. Cir. 1991) ("[T]he facts as alleged indicate that GHA discontinued its contractual relationship with CSI solely because an individual associated with CSI was Jewish . . . [T]he injury suffered by the plaintiff falls within the zone of interests protected by the statute [§ 1981]. . . . "). Although such decisions discuss § 1981 in the context of contract-based claims, there is no reason not to extend the same analysis to § 1981 claims brought under the "full and equal benefit" clause as well. No defendant contends that Moonblatt's claim is improper because he is Caucasian.

employees of CCA rather than the District, the District argues that it is not vicariously responsible for their actions.  <u>See</u> Def.'s Mot. at 14.

It is well established that an employer can be held responsible for the torts of an employee under the doctrine of *respondeat superior*. <u>Phelan v. City of Mount Rainier</u>, 805 A.2d 930, 937-38 (D.C.2002).  Thus, if Moonblatt can demonstrate that the alleged tortfeasors are employees of the District who acted intentionally and within the scope of their employment, the District may be held liable for their actions. <u>Moorehead v. Dist. of Columbia</u>, 747 A.2d 138, 143 (D.C. 2000); <u>Wade v. Dist. of Columbia</u>, 310 A.2d 857, 863 (D.C.1973). However, if the alleged tortfeasors are instead employees of CCA, Moonblatt faces the more difficult task of establishing an agent-principal relationship (or a master-servant relationship) that would render the District liable for CCA's actions. The D.C. Court of Appeals has listed the following factors as pertinent to the master-servant relationship inquiry: (1) the selection and engagement of the servant; (2) the payment of wages; (3) the power to discharge; (4) the power to control the servant's conduct; and (5) whether the work is part of the regular business of the employer. <u>Hampton</u>, 666 A.2d at 38-39 (quoting <u>Safeway Stores, Inc. v Kelly</u>, 448 A.2d 856, 860 (D.C. 1982)). Of the five, "'the determinative factor' is usually the fourth: 'the right to control an employee in the performance of a task and in its result, and not the actual exercise of control or supervision.'" <u>Id.</u>

The District correctly points out that, with the exception of Steve Smith, a warden at the institution, Moonblatt has not alleged that any of the tortfeasors in question are employees of the District. Similarly, Moonblatt also does not directly allege that he was harmed by employees of CCA. His complaint is silent on this point, and as discussed above, the appropriate legal standard depends on the correct characterization of these individuals' employment status.

On a motion to dismiss, this Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences that can be derived from the alleged facts. Conley v. Gibson, 355 U.S. 41, 45-46, (1957); Kowal v. MCI Communications Corp.,16 F.3d 1271, 1276 (D.C. Cir. 1994).  That is particularly so where, as here, the plaintiff filed the complaint *pro se*. Recognizing that the Court is in need of more information in order to consider the validity of his common law claims, Moonblatt has asked that the Court allow him to amend his complaint to provide more detailed allegations. Cognizant of the fact that this complaint was initially filed *pro se*, the Court will grant this request and allow Moonblatt to add factual specificity to Counts III through V. Specifically, the Court requires additional information regarding the identity of the alleged tortfeasors and their employers. Moonblatt must offer enough detail to support his claims of vicarious liability or to demonstrate that an agency relationship existed between the alleged perpetrators, CCA, and the District. The court will not entertain additional facts or allegations that go beyond that narrow scope. In anticipation of this particular information, defendants' motion to dismiss on this basis will be denied without prejudice.

IV.    *Count VI: DCHRA Claim Against All Defendants*

Finally, Moonblatt alleges that defendants have violated the DCHRA through their discriminatory acts against him motivated by his race, religion, and sexual orientation. Unfortunately, Moonblatt's complaint does not cite a specific provision of the DCHRA under which he wishes to bring these claims. Thus, it is not clear what DCHRA provision, if any, applies here. The District, however, cites to D.C. Code § 2-1402.11, a part of the DCHRA that prohibits discrimination in the employment context. See Def.'s Mot. at 11. At first glance, that

provision does not appear to be pertinent to the present case. It is conceivable -- although unlikely -- that Moonblatt's allegations could fall under D.C. Code § 2-1402.31, which prohibits discrimination in all places of public accommodation. Similarly, the housing portion of the DCHRA found in D.C. Code § 2-1402.01 may embrace Moonblatt's allegations here, although the Court is skeptical regarding the viability of that option as well.

Nonetheless, the Court recognizes that the DCHRA "is a remedial civil rights statute that must be generously construed." Executive Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d 724, 731 (citing Wallace v. Skadden Arps, Slate, Meagher & Flom, 715 A.2d 873, 889 (D.C. 1998); Simpson v. D.C. Office of Human Rights, 597 A.2d 392, 398 (D.C. 1991)). A broad reading of the Act is consistent with the legislative intent underlying the DCHRA. See Lively v. Flexible Packaging Ass'n, 830 A.2d 874, 887 (D.C. Cir. 2003). Thus, because the District apparently concedes that the DCHRA is applicable to Moonblatt's case, the Court will assume at this juncture that a cause of action exists because no party has yet asked the Court to dismiss this claim for want of a DCHRA cause of action.

The main contention between the parties here concerns the pertinent statute of limitations, which requires that a DCHRA claim be filed "within one year of the unlawful discriminatory act, or the discovery thereof."  See D.C. Code § 2-1403.16. The District claims that all of Moonblatt's allegations arising from his first two incarcerations must be dismissed because they fall outside of the one year limitations period imposed by the DCHRA. See Def.'s Mot. at 11-12. Purely as a matter of elapsed time, the injuries arising out of Moonblatt's first two incarcerations do fall outside of that window. The first period ended on October 29, 2004 and the

second period on February 29, 2005. Compl. at ¶ 11. Moonblatt filed his complaint on October 25, 2007, well beyond the one-year deadline for each period.

District law, however, provides for equitable tolling of all rights of action until incarcerated individuals are released from custody. See D.C. Code § 12-302.[6] Moonblatt was released from custody for the first time on October 29, 2004. See Compl. at ¶ 11. The one year statute of limitations for any DCHRA claim arising out of that detention began to run at that point. Moonblatt was again imprisoned twenty-three days later on November 22, 2004, stopping the clock on the one-year period. Id. Moonblatt was then released for the second time on February 28, 2005 and was subsequently free for 342 days before he was incarcerated again on February 16, 2006. Id. Moonblatt was thus free for a total of 365 days before he was re-incarcerated the third time. That is, the limitations period expired regarding the alleged violations that occurred during the first period. After Moonblatt was released from prison the final time, on December 30, 2006, he still had twenty-three days remaining to bring a claim for the alleged violations that occurred during his second period of imprisonment. Id. But he did not file his complaint until October 25, 2007, and thus the statute of limitations ran for the alleged harms during that period, as well. It is important to note, however, that Moonblatt states in his complaint that the dates of his incarceration that he provides are mere approximations; they could, therefore, be inaccurate. Id.; see also Def.'s Mot. at 12. Thus, because the dates provided by Moonblatt (and adopted by the District) are offered only as estimates, the Court is hesitant to rely solely on that data to make a final timeliness determination at this point.

---

[6] D.C. Code § 12-302 provides in pertinent part: "[W]hen a person entitled to maintain an action is, at the time the right of action accrues: (1) under the age of 18 years of age; or (2) non compos mentis; or (3) imprisoned -- he or his proper representative may bring action within the time limited after the disability is removed."

Even if Moonblatt's first two periods of incarceration are time barred, however, it may be possible for him to invoke the "continuous violation" doctrine. The Supreme Court has held that, in certain situations, continuous violations extending over a period of time can be considered a single unlawful act or practice for limitations purposes, provided that some of the claims brought are timely. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002); see also Lively, 830 A.2d at 890. Under this "continuous violation exception," isolated acts that fall outside of the limitations period can be grouped with acts that fall within it to render the claim timely, even if there are "significant gaps in the occurrence of acts . . . that take place 'over a series of days or perhaps years.'" Lively, 830 A.2d at 890 (citing Morgan, 536 U.S. at 117).[7] In Lively, where the plaintiff sued for wrongful termination due to discrimination, the Court emphasized the pervasive and cumulative harm that repeated discriminatory conduct can inflict upon an individual. Id. at 888-90. It is this effect that anti-discriminatory statutes seek to guard against, and it is the potential severity of injury that justifies grouping many incidents together to form one hostile practice, even where some of the alleged conduct falls outside of the limitations period. Id.  The continuous violation exception could conceivably apply in this case.  Neither Moonblatt nor the District discuss this possibility, however.

Due to the uncertainty of the provision (if any) giving rise to the cause of action under the DCHRA and the uncertainty concerning the exact dates of Moonblatt's imprisonment, this Court declines to issue a final statute of limitations determination at this point. It should be noted, however, that courts often apply a "generous construction" to the DCHRA's statute of limitations. See, e.g., Simpson, 597 A.2d at 401. The D.C. Court of Appeals has plainly stated

---

[7] Courts generally employ this analysis in Title VII cases (as in Morgan), but as the court in Lively pointed out, it is common practice to adopt federal Title VII analysis when evaluating provisions of the DCHRA. Lively, 830 A.2d at 890.

that "[i]f there is any reasonable doubt in a statute of limitations problem, the [c]ourt will resolve the question in favor of the complaint standing and against the challenge." Id. (citing Saunders v. Holloway Const. Co., Inc., 724 F. Supp 640, 642 (W.D.Ark 1989)).  That directive guides the Court's decision here and the parties should address this issue within that context going forward. The Court emphasizes once more than Moonblatt is receiving especially lenient treatment at this juncture because his complaint was originally filed *pro se*.  Now that he has evidently secured counsel, the Court expects that the many deficiencies and omissions found in his pleadings will be remedied.  Moreover, CCA would be wise to file its own supporting memorandum rather than rely upon the District's efforts, many of which do not address issues in terms that are relevant to CCA.  For present purposes, defendants' motions on this point will be denied without prejudice.

## CONCLUSION

For the foregoing reasons, the Court will deny defendants' various motions to dismiss.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____<br>JOHN D. BATES<br>UNITED STATES DISTRICT JUDGE

Date: August 1, 2008